1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TIM NAY, *et al.*,

                    Plaintiffs,

        v.

BNSF RAILWAY COMPANY, *et al.*,

                    Defendants.

Case No. C19-5425-BHS-MLP

ORDER

## I.    INTRODUCTION

This matter is before the Court on Defendants BNSF Railway Company ("BNSF"),

National Railroad Passenger Company (d/b/a/ "Amtrak"), Timothy Burch, and Thomas

Matlock's Motion to Strike Expert Disclosures and Proposed Testimonies ("Defendants'

Motion"). (Defs.' Mot. (dkt. # 77).) Defendants request that the Court strike the expert

disclosures and proposed testimonies of Brandon Ogden and Joellen Gill because their expert

opinions fail to meet the standards established by Federal Rule of Evidence 702 and *Daubert v.

Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). (*Id.* at 1.)

Plaintiffs Tim Nay, in his capacity as personal representative of the estate of Maria

Gonzalez Torres ("Ms. Gonzalez Torres"), and Gregory Price, in his capacity as guardian ad

ORDER -1

1  litem of minor I.G., oppose Defendants' Motion. (Pls.' Resp. (dkt. # 82).). Defendants filed a

2  reply. (Defs.' Reply (dkt. # 90).) Neither party requested oral argument.

3       Having considered the parties' submissions, the governing law, and the balance of the

4  record, the Court GRANTS in part and DENIES in part Defendants' Motion (dkt. # 77), as

5  further explained below.

6                              **II.     BACKGROUND**

7       Plaintiffs filed a wrongful death action arising from an Amtrak train/vehicle collision at a

8  private railroad grade crossing ("the Crossing") in Camas, Washington, that resulted in the death

9  of Ms. Gonzalez Torres on May 16, 2017.[1] (Pls.' Am. Compl. (dkt. # 31).) Due to the nature of

10 the accident, Plaintiffs secured Mr. Ogden, a railway operations consultant, and Ms. Gill, a

11 human-factors engineering consultant, to offer expert testimony regarding BNSF and Amtrak's

12 ("Railroad Defendants") train operations and rule interpretations. (Pls.' Resp. at 1.)

13      **A.     Brandon Ogden**

14      Mr. Ogden is a railway operations consultant who has a decade of experience as a BNSF

15 certified switchman and conductor. (Ogden Decl. (dkt. # 83) at ¶¶ 2, 19, Ex. 1 (dkt. # 83-1) at

16 2-3, 29-30.) While working at BNSF, Mr. Ogden served as a Trainmaster, Director of

17 Administration, Terminal Manager, and Superintendent of Operations. (*Id.* at ¶ 19, Ex. 1 at 2-3,

18 29-30.) Mr. Ogden's previous experience includes investigating derailments, crossing accidents,

19 and personal injuries, and he has previously supervised new hire training programs for BNSF

20 employees. (*Id.* at ¶ 20, Ex. 1 at 2-3, 29-30.) In addition, Mr. Ogden has previously been retained

21 as a railroad operations expert concerning train handling, switch operation, hand brake operation,

22

23 ---
[1] In addition to the Defendants' instant Motion, Defendants concurrently filed a motion for summary judgment. (Dkt. # 71.) Defendants' motion for summary judgment remains pending determination by this Court.

grade crossing collisions, train/pedestrian incidents, rail equipment movement, and evaluation of railroad employee rule compliance, and has provided expert testimony in over a dozen cases. (*Id.* at ¶ 22, Ex. 1 at 2-3, 29, 32-33.)

As to his first opinion, Mr. Ogden opines that Railroad Defendants failed to give a proper audible warning at the Crossing because the train's video evidence confirms Defendant Matlock, the train's engineer, did not blow the horn until about a second prior to the collision with Ms. Gonzalez Torres's vehicle and because there were no active or audible warning devices at the Crossing. (Ogden Decl., Ex. 1 at 7, 10.) Mr. Ogden posits that an improper visual warning was provided at the Crossing due to impaired sight distances to motorists that failed to allow motorists to determine the location of the Crossing, its condition, warning devices, and whether a train is approaching. (*Id.* at 7-9.) Finally, Mr. Ogden opines that Railroad Defendants allowed several dangerous and hazardous conditions to exist at the Crossing, making it an unreasonable and unsafe place to cross. (*Id.* at 7.) On this point, Mr. Ogden notes improper design, layout, and engineering of the roadway approach to the Crossing, improper placement of passive warning signs, the absence of any advanced or active warning signs, and substantial vegetation visibility obstructions. (*Id.* at 8-16.)

Next, under his second opinion, Mr. Ogden opines that BNSF's "Crossing Closure Program" tasked BNSF with properly evaluating the Crossing for potential closure. (Ogden Decl., Ex. 1 at 16-17; *see also id.*, Ex. 2 (dkt. # 83-2) at 3-4.) Based on factors to be considered under the program, Mr. Ogden concludes Railroad Defendants failed to properly evaluate the Crossing for closure. (*Id.* at 16-18.) As support for this opinion, Mr. Ogden notes that: (1) one to two high-speed Amtrak passenger trains operated over the Crossing daily, with a maximum authorized speed of 70 miles per hour; (2) there were four alternate private railroad crossings

within 2,250 feet of the Crossing, with one only 350 feet west of the Crossing, making the Crossing redundant and unnecessary; (3) the ease of closing the Crossing as private crossings are closed more frequently due to accidents happening at a higher rate than public crossings and the lessened notice time required to close a private crossing; (4) the Crossing covered mainline track; (5) the low volume of vehicle traffic at the Crossing because it served only 12 residential homes; (6) the high volume of freight trains operating over the Crossing because 32-42 freight trains operated over the Crossing daily with a maximum authorized speed of 60 miles per hour; (7) the minimal amount of warning devices in place at the Crossing; (8) the hazardous conditions at the Crossing due to its layout and design; and (9) because BNSF was aware of at least one other previous train/vehicle collision at the Crossing. (*Id.* at 16-18.)

As to his third opinion, Mr. Ogden opines that Railroad Defendants and their employees violated federal regulations and their own operating rules, processes, procedures, and industry standards of care in operating the Amtrak train over the Crossing. (Ogden Decl., Ex. 1 at 19-27.) Mr. Ogden notes that several BNSF engineers had previously indicated speedometer defects with the train between May 14, 2017, and May 16, 2017, and that due to federal regulations concerning speedometers under 49 C.F.R. § 229.117, the train should not have been operated in excess of 20 miles per hour until the defects had been repaired.[2] (*Id.* at 19-23.) Mr. Ogden further notes that Defendant Matlock blew the horn only a single time for three seconds about

---

[2] Per 49 C.F.R. § 229.117:

    (a) After December 31, 1980, each locomotive used as a controlling locomotive at speeds in excess of 20 miles per hour shall be equipped with a speed indicator which is - (1) Accurate within ±3 miles per hour of actual speed at speeds of 10 to 30 miles per hour and accurate within ±5 miles per hour at speeds above 30 miles per hour; and . . .

    (b) Each speed indicator required shall be tested as soon as possible after departure by means of speed test sections or equivalent procedures.

ORDER -4

1    one second prior to impact with Ms. Gonzalez Torres's vehicle and that he should have instead

2    sounded the horn with two long whistles, one short whistle, and one long whistle lasting between

3    15 and 20 seconds before entering the Crossing. (*Id.* at 23.) Finally, Mr. Ogden found that

4    Railroad Defendants failed to conduct a proper root cause analysis after a previous train/vehicle

5    collision at the Crossing and that their training of their employees was deficient because Railroad

6    Defendants failed to advise their crews to recognize safety hazards present at the Crossing. (*Id.* at

7    26-28.)

8         **B.    Joellen Gill**

9         Ms. Gill is a human-factors engineer consultant who has 42 years of experience in human

10   factors engineering with an emphasis in safety and risk management.[3] (Gill Decl. (dkt. # 84) at

11   ¶ 4, Ex. 2 (dkt. # 84-2) at 2-3.) She has performed the roles of research associate, human factors

12   engineering associate, and senior engineer, and done theoretical work in the area of safety,

13   including warning design and effectiveness. (*Id.* at ¶ 5, Ex. 1 (dkt. # 84-1) at 4, Ex. 2 at 2-3.) Ms.

14   Gill has a Bachelor of Science in human factors engineering, a Master of Business

15   Administration Degree, and a Master of Science Degree in Environmental Engineering. (*Id.*, Ex.

16   1 at 4, Ex. 2 at 2-3.) She has been certified as a human factors professional since 2006, certified

17   as a safety professional since 2013, and is a licensed tribometrist. (*Id.*, Ex. 2 at 2-3.) Relevant to

18   the instant matter, Ms. Gill has previously consulted on railroad accident cases as a

19   human-factors engineering consultant. (*See id.*, Ex. 2 at 2; Sanders Decl. (dkt. # 85), Ex. 2 (Gill

20   Dep. (dkt. # 85-2) at 8:24-9:3).)

21

22

23   ---
[3] Human factors engineering combines traditional engineering disciplines with human behavioral
sciences. (Gill Decl., Ex. 1 (dkt. # 84-1) at 1.) The discipline analyzes human behavior in an attempt to
understand and protect against potential failures in safety systems. (*Id.*)

ORDER -5

1    Per her submitted report, Ms. Gill documented several system design factors of Railroad

2  Defendants' safety or risk management program. (Gill Decl., Ex. 1 at 5.) Specifically, Ms. Gill's

3  report provides a detailed examination of the safety systems through the system design factors

4  of: (1) Hazard Analysis; (2) Plan Development; (3) Plan Implementation; (4) Plan Evaluation;

5  and (5) Documentation. (*Id.*) Each of the factors were analyzed in relation to Ms. Gonzalez

6  Torres's collision. (*Id.*)

7    Under Ms. Gill's Hazard Analysis, Ms. Gill examined *a priori* and *post hoc* issues

8  associated with the potential for train/vehicle collisions at the Crossing. (Gill Decl., Ex. 1 at 5-6.)

9  In relevant part, Ms. Gill's report noted the Crossing was hazardous because: (1) the Crossing

10  was an unguarded at-grade crossing; (2) the intermittent frequency of train use at the Crossing;

11  (3) visual obstructions that existed at the Crossing and their effect on a motorist's perception

12  reaction time; (4) issues concerning inattentional blindness; (5) train speeds at the Crossing; and

13  (6) motorist behavior at the Crossing. (*Id.* at 6-11.) Ms. Gill's *a priori* analysis concluded the

14  Crossing was "extremely dangerous for drivers." (*Id.* at 11.) Per her *post hoc* analysis, Ms. Gill

15  determined that Railroad Defendants should have known of the conditions at the Crossing before

16  Ms. Gonzalez Torres's collision and that Railroad Defendants failure to remedy the conditions

17  were "gross violations" of the basic principles of safety and risk management. (*Id.*)

18    Under Ms. Gill's Plan Development examination, Ms. Gill outlined a three-level

19  hierarchical safety process for creating a plan to control known hazards. (Gill Decl., Ex. 1 at 12.)

20  Per that structure, Ms. Gill noted three tiers to the "Safety Hierarchy": (1) "safety by design,"

21  which eliminates the hazard by system design; (2) "guarding," which provides a barrier between

22  a user and a potential hazard; and (3) "persuasion control," which uses warnings, trainings, or

23  other types of human intervention to improve overall user safety in the system. (*Id.*) On this

aspect, Ms. Gill concluded that Railroad Defendants' sole reliance on "persuasion control" was an underlying root cause of Ms. Gonzalez Torres's train/vehicle collision at the Crossing. (*Id.*) Specifically, Ms. Gill noted that Railroad Defendants failed to control vegetation growth at the Crossing to afford an unimpeded line-of-sight, failed to train their employees to report obstructive vegetation, and failed to give an audible warning at the Crossing. (*Id.* at 12-13.)

As to the final three factors of her evaluation, Ms. Gill determined, under the Plan Implementation factor, that the Railroad Defendants failed to develop a meaningful plan for mitigating life-threatening hazards present at the Crossing. (Gill Decl., Ex. 1 at 13-14.) Under the Plan Evaluation step, Ms. Gill concluded that, despite being aware of the importance of routine and ongoing evaluations, Railroad Defendants failed to respond to known hazards associated with at-grade crossings and otherwise failed to maintain the Crossing in a safe condition. (*Id.* at 14.) Finally, under the Documentation step, Ms. Gill noted the record she reviewed was devoid of any documentation relative to Railroad Defendants having previously undertaken any analysis regarding the conditions at the Crossing. (*Id.*)

## III.   DISCUSSION

Federal Rule of Evidence 702 provides in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Therefore, it follows that for expert testimony to be admissible under Rule 702, it must satisfy three requirements: (1) the expert witness must be qualified; (2) the testimony must be reliable; and (3) the testimony must be relevant. *See Daubert*, 509 at 589-91.

The proponent of expert testimony has the burden of establishing that the admissibility requirements are met by a preponderance of the evidence. *Id.* at 592 n.10; *see also Lust v. Merrell Dow Pharms. Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

Before admitting expert testimony into evidence, the Court acts as a "gatekeeper" in determining its admissibility under Rule 702 by ensuring the testimony is both "relevant" and "reliable." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (citing *Daubert*, 509 U.S. at 597). Expert testimony is relevant where "the evidence logically advance[s] a material aspect of the party's case." *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007)). Testimony is reliable where it has "a reliable basis in the knowledge and experience of the relevant discipline." *Id.* (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999)).

The Supreme Court has noted that the reliability inquiry is a "flexible one," and while the Supreme Court has suggested several factors helpful in determining reliability, trial courts are generally given "broad latitude in determining the appropriate form of the inquiry."[4] *United States v. Wells*, 879 F.3d 900, 934 (9th Cir. 2018) (quoting *Kumho Tire*, 526 U.S. at 150); *see also Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (finding Rule 702 should be applied with a "liberal thrust" favoring admission) (quoting *Daubert*, 509 U.S. at 588); *United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) (Rule 702 is "construed liberally" in considering admissibility of testimony based on specialized knowledge). Furthermore, the reliability inquiry favors admission of testimony as "[s]haky but admissible evidence is to be

---

[4] In relevant part, *Daubert* suggested several reliability factors a trial court may examine to determine the reliability of expert testimony, including: (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; (4) the existence and maintenance of standards and controls; and (5) whether the theory or technique enjoys general acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 592-94; *see also Mukhtar v. California State Univ., Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002).

ORDER - 8

attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 596).

Finally, the reliability inquiry test does not seek to measure "the correctness of the expert's conclusions but the soundness of [his or her] methodology," and therefore, when an expert meets the standards established by Rule 702, "the expert may testify[,] and the fact finder decides how much weight to give that testimony." *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014) (quoting *Primiano,* 598 F.3d at 564-65).

### A.    Brandon Ogden

Defendants argue Mr. Ogden's testimony should be excluded because: (1) Mr. Ogden is not qualified to offer an expert opinion; and (2) Mr. Ogden's methodology fails to satisfy standards set forth in Rule 702 or *Daubert*. (Defs.' Mot. at 1, 4-15.) The Court will address each of Defendants' arguments regarding why Mr. Ogden's report and testimony should be excluded in turn:

#### i.    *Expert Qualifications*

First, Defendants argue that Mr. Ogden's education and experience lacks railroad industry experience and engineering standards to allow him to give an expert opinion in this case. (Defs.' Mot. at 6-7.) Plaintiffs counter that Mr. Ogden's proffered testimony regarding Railroad Defendants' train operations and rules interpretations is proper due to his extensive experience previously working for BNSF. (Pls.' Resp. at 3-4.)

On this issue, the Court must determine whether Mr. Ogden is qualified as an expert by "knowledge, skill, experience, training or education." Fed. R. Evid. 702. An expert is considered qualified to testify if the expert has "sufficient specialized knowledge to assist the jurors in

1    deciding the particular issues in the case." *Kumho Tire*, 526 U.S. at 156. Because Rule 702

2    "contemplates a *broad conception* of expert qualifications," only a "*minimal foundation* of

3    knowledge, skill, and experience" is required. *Hangarter v. Provident Life & Accident Ins. Co.*,

4    373 F.3d 998, 1015-16 (9th Cir. 2004) (internal quotations and citation omitted, emphasis in

5    original). Consequently, a "lack of particularized expertise goes to the weight of [the] testimony,

6    not its admissibility." *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993) (citing *United*

7    *States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1984).

8         Here, the Court finds that Mr. Ogden is sufficiently qualified to testify as to Railroad

9    Defendants' railroad operations based on his knowledge and prior experience with BNSF. As

10   previously outlined, Mr. Ogden has a decade of relevant experience with BNSF. (*See* Ogden

11   Decl., Ex. 1 at 2-3, 30.) Pertinent to the instant matter, Mr. Ogden's experience also includes

12   investigating crossing accidents and train/vehicle collisions. (*Id.* at 2-3, 29-30.) Moreover,

13   though not dispositive, the Court further notes that Mr. Ogden has previously qualified to

14   provide expert testimony on railroad operations and rule interpretations multiple times in federal

15   courts—including this Court—based on his background and relevant experience. (*See* Ogden

16   Decl., Ex. 1 at 32-33 (citing *Rossich* v. *BNSF Ry. Co.*, Case No. C18-5829-RBL, Dkt. ## 101,

17   102 (W.D. Wash.)); *see also Smith v. BNSF Ry. Co.*, 2020 WL 2297798, at *3 (E.D. Wash. Jan.

18   30, 2020) (allowing Mr. Ogden to present evidence or testimony regarding "trains and

19   locomotive operations.")). Therefore, the Court declines to disqualify Mr. Ogden from testifying

20   in this matter based on a lack of qualifications to render an expert opinion.

21              *ii.     Vegetation and Obstructions*

22         Next, Defendants argue that Mr. Ogden's opinions pertaining to vegetation obstructing

23   Ms. Gonzales Torres's vision relies on deceptive and misleading photographs, pursuant to Rule

702(b) and Rule 403, because they fail to depict the driver's view of the railroad had Ms. Gonzalez Torres stopped at the stop sign at the Crossing. (Defs.' Mot. at 7-11.) Defendants additionally argue that Mr. Ogden's opinion that Defendants were required to correct visibility obstructions caused by vegetation under RCW 36.86.100 is misleading under Rule 403 because Southwest Viola, the road the Crossing intersects, is a private road. (*Id.* at 11.)

Plaintiffs argue that the photographs referenced in Mr. Ogden's report were a reliable source because they accurately depict vegetation present at the Crossing. (Pls.' Resp. at 5-7.) Plaintiffs further contend that Mr. Ogden's testimony referencing RCW 36.86.100 was not to demonstrate that it was applicable to Southwest Viola, but to demonstrate relevant custom and practices in the railroad industry with regard to vegetation and sight distances that Defendants should have followed. (*Id.* at 7-8.)

Pursuant to Rule 702(b), the requirement that expert testimony be based on "sufficient facts or data" requires the Court to engage in "an analysis of the sufficiency of underlying facts or data that is quantitative rather than qualitative." *United States v. W.R. Grace*, 455 F.Supp.2d 1148, 1152 (D. Mont. 2006); *see also* Advisory Committee Notes to 2000 Amendments to Fed R. Evid. 702. The requirement "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." *W.R. Grace*, 455 F.Supp.2d at 1152. Pursuant to Rule 403, the Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of misleading the jury. Fed. R. Evid. 403.

On this point, the Court finds that Mr. Ogden's cited photographs provided adequate factual support for his opinions under Rule 702(b). Based on the record, the photographs referenced in Mr. Ogden's report provide a depiction of the vegetation present at the Crossing at

1   some time after the collision. (Ogden Decl., Ex. 1 at 10-12.) It is clear from Mr. Ogden's report

2   that he also consulted the photographs that were taken by police at the scene immediately after

3   Ms. Gonzalez Torres's collision. (*See id.* at 6.) Though the police photos of the collision were

4   not specifically referenced in his opinion, any issues as to what photographs of the Crossing were

5   more appropriate for Mr. Ogden to consult in constructing his report would go to the weight, and

6   not the admissibility, of his testimony. *See Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230-31

7   (9th Cir. 1998) (citation omitted) ("Disputes as to the strength of [an expert's] credentials, faults

8   in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the

9   weight, not the admissibility, of [his] testimony")). Defendants are free to cross-examine Mr.

10  Ogden on any alleged deficiencies with his report at trial. *See Daubert*, 509 U.S. at 596; *see also*

11  *Bluetooth SIG, Inc. v. FCA US LLC*, 468 F.Supp.3d 1342, 1349 (W.D. Wash. 2020) ("[T]he

12  factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility,

13  and it is up to the opposing party to examine the factual basis for the opinion in

14  cross-examination." (quoting *In re Toyota.*, 978 F.Supp.2d 1053, 1069 (C.D. Cal. 2013)).

15      However, the Court finds that Mr. Ogden's reliance on RCW 36.86.100 as to the

16  vegetation visibility obstructions is misleading under Rule 403. In his report, Mr. Ogden referred

17  to RCW 36.86.100, in conjunction with a Federal Highway Administration's ("FHA")

18  "Highway-Rail Crossing Handbook," in demonstration of "the importance of removing

19  obstructions and allowing motorists proper sight distance approaching railroad grade crossings."

20  (*See* Ogden Decl., Ex. 1 at 10.) Yet, Mr. Ogden's report ultimately opines that Defendants

21  violated RCW 36.86.100 in failing to contain the vegetation obstruction at the Crossing. (*See id.*

22  ("[Railroad Defendants] failed to clear visibility obstructions . . . from their own right of way to

23  allow motorists approaching the crossing adequate sight distance down the tracks in both

directions, *violating Washington law* and the Highway-Rail Crossing Handbook." (emphasis added)).) It is not disputed by the parties that Southwest Viola was a private road. (*See* Pls' Resp. at 7.) It is also clear that RCW 36.86.100 only applies to county roads—and not private roads.[5] Therefore, Mr. Ogden's citation to RCW 36.86.100 to show that Defendants' failure to remove obstructive vegetation at the Crossing was a violation of Washington law is misleading and should be stricken.

Consequently, the Court declines to strike Mr. Ogden's testimony concerning vegetation at the Crossing on the basis that his opinion was not supported by his cited photographs of the Crossing. However, the portion of Mr. Ogden's expert report opining that Defendants violated Washington law, in reference to the applicability of RCW 36.86.100, is stricken.

> iii.   *Objective and Relevant Sources*

Next, Defendants make several arguments that Mr. Ogden's expert report fails to cite to objective and relevant sources under Rule 702(b) to support his opinions that: (1) Defendants Burch and Matlock ("Traincrew Defendants") failed to exercise reasonable care; (2) BNSF failed to complete a root cause analysis; and (3) that Railroad Defendants failed to properly train their employees.[6] (Defs.' Mot. at 11-15.)

---

[5] RCW 36.86.100 provides in relevant part that:

> Each railroad company shall keep its right-of-way clear of all brush and timber in the vicinity of a *railroad grade crossing with a county road* for a distance of one hundred feet from the crossing in such a manner as to permit a person upon the road to obtain an unobstructed view in both directions of an approaching train or other on-track equipment . . . .

(emphasis added).

[6] On reply, Defendants additionally argued that: (1) Mr. Ogden should not be allowed to give his opinion as to crossing warnings and train speed because his opinions are contrary to law, would confuse the jury, and prejudice Defendants; and (2) Mr. Ogden's methodology is unreliable in that it failed to consider motorist behavior at the Crossing. (Defs.' Reply at 2-3.) However, Defendants failed to raise any Rule 403 or methodology issues pertaining to Mr. Ogden's consideration of motorist behavior in their Motion, or

1

                     1.    <u>Defendant Burch</u>

2        Defendants argue that Mr. Ogden's opinion that Defendant Burch, the train's assistant

3  conductor, failed to exercise reasonable care does not cite objective and relevant sources under

4  Rule 702(b) because his role as an assistant conductor limited his responsibilities. (Defs.' Mot. at

5  11-12.) Plaintiffs argue that Mr. Ogden's opinions regarding Defendant Burch are reliable due to

6  Defendant Burch's deposition testimony and Mr. Ogden's experience. (Pls.' Resp. at 8-10.)

7        As previously noted, in his third opinion in his report, Mr. Ogden opined that Railroad

8  Defendants and their employees violated federal regulations, their own operating rules and

9  processes/procedures, and industry standards of care that are the custom and practice of the

10  industry. (Ogden Decl., Ex. 1 at 19.) At various points in his report, based on Defendant Burch's

11  deposition testimony, Mr. Ogden found Defendant Burch was not familiar with: (1) certain

12  speedometer requirements; (2) federal regulations regarding train speed; (3) whether the horn

13  must be sounded in a specific manner for a specific duration at private crossings; and/or (4)

14  particular responsibilities regarding reporting unsafe crossings and near misses. (*See id.* at 21-22,

15  25, 27.)

16        Here, the Court finds that Mr. Ogden's opinion as to Defendant Burch is adequately

17  supported. Though Defendant Burch did not operate as the engineer of the train in this instance,

18  throughout his deposition testimony, Defendant Burch referenced his relevant knowledge serving

19  with Railroad Defendants as to his understanding of his responsibilities, including when working

20

21  otherwise provide substantive argument on such issues. (*See* Defs.' Mot.) Instead, these issues were raised

22  for the first time in Defendants' reply brief. Therefore, the Court declines to address Defendants' additional
arguments at this time. *See, e.g.*, *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court
need not consider arguments raised for the first time in a reply brief."); *Koerner v. Grigas*, 328 F.3d 1039,

23  1048 (9th Cir. 2003).

ORDER -14

as an engineer and not a conductor. (*See* Sanders Decl., Ex. 5 (Burch Dep. at 58:1-4, 58:13-22).)

Mr. Ogden's opinion's references to Defendant Burch's deposition testimony in his expert report

are based on sufficient facts to warrant admission of his opinion testimony as to Defendant

Burch's alleged failures to follow federal regulations, operating rules and procedures, or industry

standards of care. *See* Fed. R. Evid. 702(b). The Court therefore declines to strike this portion of

Mr. Ogden's opinion.

### 2.   Defendant Matlock

Defendants next argue that Mr. Ogden additionally fails to cite to objective and relevant

sources under Rule 702(b) for his opinion that Defendant Matlock failed to exercise reasonable

care. (Defs.' Mot. at 12-14.) Plaintiffs argue that Mr. Ogden's opinions regarding Defendant

Matlock are also reliable due to Mr. Ogden's experience and Mr. Matlock's deposition

testimony. (Pls.' Resp. at 8-10.)

Mr. Ogden's opinion first notes that Defendant Matlock indicated in comments on the

train's maintenance condition reports that the train had an erratic speedometer on May 16, 2017.

(Ogden Decl., Ex. 1 at 19.) Mr. Ogden's opinion then referenced 49 C.F.R. § 229.117 and

BNSF's "Air Brake and Train Handling Rule 101.11" to opine that Railroad Defendants violated

both the regulation and policy by failing to repair the speedometer at the next repair facility, or

upon the train's next daily inspection, and by failing to reduce train speed to 20 miles per hour

"once movement was beyond a facility where repairs could have been made or any movement

after the next daily inspection." (*Id.* at 20, 22-23.) Mr. Ogden's report additionally cites to

Defendant Matlock's testimony as support that he was not aware of the requirements to test the

speedometer or any requirements to reduce the train's speed. (*Id.* at 21; *see also* Sanders Decl.,

Ex. 4 (Matlock Dep. at 18:25-19:20, 20:11-21:2).) Based on the cited evidence and referenced

1    authority, Mr. Ogden concluded that Defendant Matlock's operation of the train at 70 miles per

2    hour was 50 miles per hour above the required speed restrictions for a train with a

3    malfunctioning speedometer. (*Id.* at 21.) Mr. Ogden further concluded that the collision could

4    have been avoided, or the severity reduced, had the train been operated at the speed required by

5    the federal regulation and the "Air Brake and Train Handling" rule. (*Id.*)

6         Mr. Ogden's report additionally opined that Defendant Matlock failed to give a

7    reasonable and timely audible warning prior to entering the Crossing. (Ogden Decl., Ex. 1 at

8    23-24.) Mr. Ogden noted that, per event recorder data and police reports, Defendant Matlock

9    sounded the train's horn one time for three seconds one second prior to impact with Ms.

10   Gonzalez's Torres's vehicle. (*Id.*) Mr. Ogden concluded Matlock should have sounded the

11   locomotive horn with two long whistles, one short whistle, and one long whistle sequence lasting

12   between 15 and 20 seconds before entering the Crossing based on his training and experience in

13   the custom and practice of the railroad industry and due to how CSX Transportation and Norfolk

14   Southern Railway operate in regard to private crossings, citing letters from those operations. (*Id.*)

15   Mr. Ogden also noted, per Mr. Matlock's deposition testimony, that he does not blow the horn

16   for private crossings without whistle boards because Railroad Defendants do not require it. (*Id.* at

17   24-25; *see also* Sanders Decl., Ex. 4 (Matlock Dep. at 31:5-21).) Finally, as part of his overall

18   conclusion that Railroad Defendants failed to properly train their employees, Mr. Ogden's report

19   cites Defendant Matlock's deposition testimony indicating that he was not trained to report

20   unsafe crossings and to only report near misses at crossings if it delays their train. (Ogden Decl.,

21   Ex. 1 at 26-27; *see also* Sanders Decl., Ex. 4 (Matlock Dep. at 42:24-43:25, 44:8-21).)

22        Based on Defendant Matlock's deposition testimony, and the above-cited evidence in his

23   report, the Court finds that Mr. Ogden's report incorporates sufficient facts for his opinions

ORDER -16

concerning Defendant Matlock under Rule 702(b). In any event, Defendants' issues as to Mr. Ogden's referenced authority for his opinion are weight of the evidence concerns. *See Kennedy*, 161 F.3d at 1230-31. The Court therefore finds that Mr. Ogden's report provided adequate support for his opinions regarding Defendant Matlock.

### 3.   Root Cause

Defendants next argue that Mr. Ogden's opinion that a root cause analysis would have prevented Ms. Gonzalez Torres's death is unsupported under Rule 702(b) because there was no similar collision at the Crossing. (Defs.' Mot. at 14-15.) Plaintiffs respond that Mr. Ogden's opinion that Railroad Defendants failed to complete a root cause analysis was supported by the first known collision at the Crossing and by Mr. Ogden's previous experience performing root cause analyses. (Pls.' Resp. at 10-11.)

On this issue, Mr. Ogden's report found that Railroad Defendants failed to complete a root cause analysis, identify all factors that contributed to or caused the collision, and implement appropriate corrective actions to prevent recurrence after the first known train/vehicle collision at the Crossing. (*See* Ogden Decl., Ex. 1 at 25-26.) As a result, Mr. Ogden opined that Ms. Gonzalez Torres's death may have been avoided had a root cause analysis followed after a prior known collision at the Crossing. (*Id.*) Mr. Ogden's report does not provide any detail as to the first train/vehicle collision at the Crossing. (*See id.*)

Here, based on the briefing as to this issue, it appears contested by the parties whether a "similar" collision did in fact occur at the Crossing. However, in materials submitted with their pending motion for summary judgment, Defendants submitted an accident report detailing that there was a prior train/vehicle collision at the Crossing in 1993. (Yates Decl., Ex. M (dkt. # 72-13) at 2.) Based on the report, the collision occurred due to the motorist failing to stop and

ORDER -17

moving over the Crossing. (*Id.*) As a result, the Court finds Mr. Ogden's root cause opinion referencing a prior collision at the Crossing is based on sufficient facts under Rule 702(b). The Court declines to strike this portion of Mr. Ogden's report.

### 4.    Failure to Train

Finally, Defendants argue that Mr. Ogden failed to cite any authority to support his opinion that BNSF was responsible for training Traincrew Defendants because they were not employees of BNSF under Rule 702(b). (Defs. Mot. at 14-15.) Similarly, Defendants contend that Mr. Ogden's report failed to provide any authority as to how Amtrak failed to train Traincrew Defendants. (*Id.*) Plaintiffs counter that Mr. Ogden's opinion that Railroad Defendants failed to train their employees was not limited to Traincrew Defendants, but all of Railroad Defendants' employees who ultimately failed to recognize safety hazards present at the Crossing, and that Traincrew Defendants' testimony provided Mr. Ogden a requisite factual basis for his opinion. (Pls.' Resp. at 11-12.)

On this issue, Mr. Ogden opined Railroad Defendants failed to train their employees to recognize safety hazards or to take reasonable steps to reduce appreciated risks associated with the Crossing. (Ogden Decl., Ex. 1 at 10, 26.) Mr. Ogden noted that Traincrew Defendants were not trained to identify and report unsafe crossings and to only report near misses at crossings if it would delay their train. (*Id.* at 26.) As support for his opinion, Mr. Ogden cited Traincrew Defendants' testimony that they did not receive such training from Railroad Defendants. (*Id.* at 26-28; *see* Sanders Decl., Ex. 4 (Matlock Dep. at 27:25-27, 42:24-43:25, 44:8-21), Ex. 5 (Burch Dep. at 30:25-31:2, 31:24-32:4, 45:10-46:2).)

Because Mr. Ogden's opinion as to Railroad Defendants' alleged failure to train references Traincrew Defendants' testimony that they did not receive training in relevant areas

1    identified by Mr. Ogden in his report, the Court finds that his opinion is based on sufficient facts

2    under Rule 702(b). Furthermore, any of Defendants' contentions that Mr. Ogden's opinion on

3    this issue lacks relevant authority as to what training was owed, or which Railroad Defendant

4    was responsible for training Traincrew Defendants, go to the weight and not admissibility of his

5    testimony. Therefore, the Court declines to strike this portion of Mr. Ogden's opinion.

6        **B.    Joellen Gill**

7        Next, Defendants argue Ms. Gill's testimony should be excluded because: (1) Ms. Gill is

8    not qualified to provide an expert opinion; and (2) Ms. Gill failed to consider facts and data

9    necessary to engage in her proposed methodology. (Defs.' Mot. at 1, 15-24.) As considered

10   above, the Court will address each of Defendants' arguments regarding why Ms. Gill's report

11   and testimony should be excluded in turn:

12           *i.    Expert Qualifications*

13       Defendants first argue that Ms. Gill's education and experience lacks relevant research

14   and industry experience to allow her to give an expert opinion in this case. (Defs.' Mot. at

15   15-17.) Defendants argue that Ms. Gill lacks experience with the railroad industry, has no

16   advanced training or degrees in human factors, and because several courts have previously

17   excluded Ms. Gill from testifying as an expert witness. (*Id.*) Plaintiffs counter that Ms. Gill is

18   qualified to render an expert opinion due to her significant knowledge, experience, training, and

19   education in human factors and because she has previously consulted on railroad accident cases.

20   (Pls.' Resp. at 14-15.)

21       Here, based on the record before the Court, the Court finds that Ms. Gill is qualified to

22   render an expert opinion on human factors in this matter. As noted by Plaintiffs, Ms. Gill has

23   testified as a human factors consultant in several cases, has relevant educational background and

ORDER -19

1    training in the field of human factors, and has previously consulted on railroad accident cases in

2    the realm of human factors. (*See* Gill Decl. at ¶¶ 4-5, Ex. 2 at 2-3; *see also* Sanders Decl., Ex. 2

3    (Gill Dep. at 8:24-9:3).) Though Defendants' grievances about Ms. Gill's specific experience

4    within the railroad industry and lack of study and research in her field are reasonable matters to

5    put before a factfinder, the Court is satisfied that Ms. Gill's background provides her the

6    "minimal foundation" required to provide an expert opinion in this matter. *See Hangarter*, 373

7    F.3d at 1015-16; *see also Garcia*, 7 F.3d at 890. Therefore, the Court declines to disqualify Ms.

8    Gill from testifying in this matter based on a lack of qualifications to render an expert opinion.

9                           *ii.      Objective and Relevant Sources*

10        Next, Defendants argue Ms. Gill's expert report fails to cite to objective and relevant

11   sources to support the entirety of her opinion. (Defs.' Mot. at 17.) Specifically, Defendants

12   contend that Ms. Gill: (1) failed to cite authority or sources that there was vegetation obscuring

13   Ms. Gonzales Torres's vision; (2) ignored federal regulations governing railroad crossings; (3)

14   improperly relied on a United States Department of Transportation ("USDOT") FHA advisory

15   publication, RCW 36.86.100, and the "Highway-Rail Crossing Handbook" as they do not apply

16   to private crossings; (4) improperly relied on BNSF materials that have not been produced; (5)

17   ignored that Ms. Gonzales Torres was required to stop at the stop sign posted at the Crossing; (6)

18   provides irrelevant information regarding other motorist behavior at the Crossing; and (7) fails to

19   cite authority or source that Defendant Matlock's view of Ms. Gonzalez Torres was obstructed.

20   (Defs.' Mot. at 17-24.)

21                           1.      <u>Vegetation and Obstructions</u>

22        Defendants argue that Ms. Gill's opinion on this aspect must be stricken under Rule

23   702(b) because she failed to consider photographs and site measurements taken by police in

ORDER -20

forming her opinion and because she has never been to the Crossing. (Defs.' Mot. at 17-18.)
Defendants note that Ms. Gill's report instead makes use of Google Maps for her measurements
and conclusions. (*Id.*) Plaintiffs counter that Ms. Gill considered all photographs and site
distance measurements taken by police in forming her opinion. (Pls.' Resp. at 18-20.)

On this issue, per her report, Ms. Gill listed the police photos as material reviewed
specific to the facts of this case and she testified in her deposition that she reviewed and relied
upon the photographs taken by police in forming her opinions. (*See* Gill Decl., Ex. 1 at 2;
Sanders Decl., Ex. 2 (Gill Dep. at 23:20-24-1).) In considering the sight distance measurements,
Ms. Gill testified she reviewed the measurements, but found they were not relevant to her
analysis because they did not include the approach to the Crossing. (*See* Yates Decl. (dkt. # 72),
Ex. S (Gill Dep. at 60:9-11).) Though Ms. Gill's opinion as to whether Ms. Gonzales Torres's
view was obstructed was largely supported by data collected from Google Maps, the Court finds
that Defendants' arguments on this issue largely go to the weight of her testimony and that she
has otherwise provided sufficient facts and data for her opinion under Rule 702(b). The Court
therefore declines to strike this portion of Ms. Gill's opinion on this basis.

## 2. Federal Regulations

Defendants next contend that Ms. Gill's opinion must be stricken because she ignored
that matters relating to controls at the Crossing, audible warnings, and visual obstructions are
preempted by federal regulations. (Defs.' Mot. at 18-19.) Plaintiffs contend that their claims are
not preempted by federal law, as argued in their response to Defendants' pending motion for
summary judgment. (Pls.' Resp. at 20; *see also* dkt. # 86 at 11-22.)

Here, the Court finds that Ms. Gill's references in her report to the conditions of the
Crossing in engaging in her human factors analysis are adequately supported by sufficient facts.

1  (*See* Gill Decl., Ex. 1 at 6-7.) Moreover, striking Ms. Gill's opinion on the basis that Plaintiffs'

2  claims are preempted would be premature at this juncture as this Court's determination on the

3  issue of preemption remains pending. Consequently, the Court declines to strike this portion of

4  Ms. Gill's opinion on this basis at this time.

5                    3.  <u>Authoritative Sources</u>

6       Defendants argue that Ms. Gill's opinion reliance on RCW 36.86.100, the "Highway-Rail

7  Crossing Handbook," and a USDOT FHA advisory publication, "Driver Behavior at

8  Rail-Highway Crossings" is misleading under Rule 403, and not based on reliable authority or

9  sufficient facts under Rule 702(b), because her cited sources do not apply to private crossings.

10  (Defs.' Mot. at 19-20.) Plaintiffs argue that Ms. Gill's reliance on the USDOT FHA Report,

11  RCW 36.86.100, and the "Highway-Rail Crossing Handbook" are permissible because they are

12  relevant and reliable sources as to what the standards are for railroad safety at crossings. (Pls.'

13  Resp. at 20-21.)

14       Here, Ms. Gill cited to RCW 36.86.100, the "Highway-Rail Crossing Handbook," and the

15  USDOT FHA advisory publication in her report to demonstrate baseline expectancies motorists

16  have as they approach a railroad crossing, and to engage in issues with visual obstructions for

17  motorists, as part of her hazard analysis inquiry. (*See* Gill Decl., Ex. 1 at 7-9.) Unlike Mr.

18  Ogden's report, Ms. Gill's report did not specifically opine that Defendants violated Washington

19  law or RCW 36.86.100. The parties also do not dispute that Southwest Viola was a private road,

20  nor that RCW 36.86.100 and the FHA advisory publication do not apply to private railroad

21  crossings. (*See* Defs.' Mot. at 20; Pls.' Resp. at. 7, 20-21.) Therefore, the Court finds that Ms.

22  Gill's opinion utilizing these sources relies on sufficient facts and data under Rule 702(b) as to

23  outlining general railroad safety standards and that the sources are not otherwise misleading

ORDER -22

under Rule 403. Furthermore, Defendants' raised concerns pertaining to the authority of these materials generally go to the weight of Ms. Gill's testimony and are better addressed at trial on cross-examination. The Court declines to strike this portion of Ms. Gill's opinion.

### 4.   BNSF Materials

Defendants argue that in support of her opinion Ms. Gill cites to documents purporting to demonstrate that BNSF recognizes a requirement to control vegetation with Bates stamped documents.[7] (Defs.' Mot. at 20-21; *see* Gill Decl., Ex. 1 at 8.) Defendants note that they have not produced the materials described in her report and that their source and validity are unknown. (*Id.*) Plaintiffs do not contest Defendants' assertion. (*See* Pls.' Resp.)

Because the BNSF documents relied upon did not originate from Railroad Defendants, and based on Plaintiffs' lack of opposition, the portion of Ms. Gill's opinion finding that BNSF recognized a requirement to control vegetation referencing cited Bates stamped BNSF materials is stricken.

### 5.   Stop Sign

Defendants argue that Ms. Gill's opinion fails to recognize that Ms. Gonzales Torres was legally required to stop at the posted stop sign at the Crossing and yield to the oncoming train. (Defs.' Mot. at 21-23.) On this point, Defendants argue that exclusion is appropriate because the evidence demonstrates Ms. Gonzalez Torres never came to a complete stop before colliding with the train. (*Id.* at 22-23.) Plaintiffs counter that Ms. Gill did not consider any statutory requirements pertaining to the stop sign because she undertook a human factors analysis on the issues in this case. (Pls.' Resp. at 21-22.)

---

[7] Ms. Gill's report notes that BNSF "recognizes their requirement to control vegetation," with a specific citation to a Bates stamped document "BNSF 0003538-0003555." (Gill Decl., Ex. 1 at 8.)

ORDER -23

As to this issue, Ms. Gill's report acknowledges that Ms. Gonzalez Torres failed to come to a complete stop at the Crossing and analyzed whether her behavior was consistent with the vast majority of drivers at this stop sign from a human factors perspective in determining the safety of the Crossing. (Gill Decl., Ex. 1 at 7, 11; *see also* Yates Decl., Ex. S (Gill Dep. at 55:16-22, 59:7-10).) Ms. Gill's opinion was based on sufficient facts and data under Rule 702(b) as she considered the relevant facts concerning Ms. Gonzalez Torres's motorist behavior from the collision to engage in her methodology. (*See* Gill Decl., Ex. 1 at 7.) The Court therefore declines to strike this portion of Ms. Gill's opinion.

6.   Observational Study

On this point, Defendants argue that Ms. Gill's reliance on an observational study should be stricken under Rule 702 because how other motorists behaved at the Crossing did not excuse Ms. Gonzales Torres's failure to stop at the stop sign at the Crossing. (Defs.' Mot. at 23-24.) Defendants cite to *Dixon v. CSX Transp.*, *Inc.*, 990 F.2d 1440 (4th Cir. 1993), to support their argument. (*Id.*) Plaintiffs argue that *Dixon* is distinguishable from the facts in this case and that Ms. Gill's reliance on the observational study is permissible because, from Ms. Gill's human factors perspective, Ms. Gonzalez Torres's behavior was consistent with the majority of motorists traveling over the Crossing. (Pls.' Resp. at 22.)

In *Dixon*, the plaintiff's human factors expert conducted an observational study of motorists at a railroad crossing and was allowed to testify. *Dixon*, 990 F.2d at 1452. The expert testified to the jury that 96 percent of motorists approaching the crossing did not stop and that 64 percent failed to look to their left. *Id.* In closing arguments, plaintiff's counsel argued that because the plaintiff had looked to his left before entering the crossing, and because plaintiff's expert's study demonstrated 64 percent of drivers did not look left, the plaintiff had "[driven]

better than everybody else out there." *Id.* The Fourth Circuit found the district court erred in admitting the survey testimony because the survey results failed to consider any legal duties imposed by state law on motorists approaching grade crossings, the study was irrelevant as to whether plaintiff had fulfilled their burden to act as a reasonably prudent person, and because it suggested plaintiff could not be considered contributorily negligent. *Id.* at 1452-53.

In this case, the observational study at issue was examined as part of Ms. Gill's human factors analysis and found that 85 percent of motorists do not stop before traversing the Crossing.[8] (Gill Decl., Ex. 1 at 11.) Per her report, Ms. Gill interpreted this data from a human factors perspective to opine that Ms. Gonzalez Torres's motorist behavior of not coming to a complete stop at the stop sign was consistent with the majority of motorists traveling over the Crossing, making the Crossing dangerous. (*Id.*) Unlike in *Dixon*, Ms. Gill did not specifically opine that Ms. Gonzalez Torres drove better than other drivers at the Crossing or that she was not contributorily negligent in causing the collision, but rather that the conditions present at the Crossing made it dangerous to motorists based on human behavior.

The Court finds that Ms. Gill's opinion's incorporation of the observational study was based on sufficient facts and data, relevant to the issues to be decided by the trier of fact regarding the safety of the Crossing in this case, and reliable based on Ms. Gill's human factors experience under Rule 702. Furthermore, the Court fails to discern an issue as to the reliability of Ms. Gill's principles and methods in engaging in her human factors methodology based on her citation to the observational study as part of her opinion. *See* Fed. R. Evid. 702(c)-(d). As such, the Court declines to strike this portion of Ms. Gill's report.

---

[8] The observational study relied upon by Ms. Gill was not conducted by Ms. Gill but by Sam Wade, a private investigator. (Pls.' Resp. at 22.)

1

2    7.    Defendant Matlock

3    Finally, Defendants argue that Ms. Gill's opinion fails to cite authority or source that

4    Defendant Matlock's view of Ms. Gonzalez Torres was obstructed. (Defs.' Mot. at 24.)

5    Defendants further contend that any discussion regarding whether Defendant Matlock was

6    required to report vegetation obstructing his vision would confuse the jury under Rule 403

7    because there is no evidence his vision was obstructed. (*Id.*) Plaintiffs argue that Ms. Gill

8    provided sufficient authority that Mr. Matlock had not been trained to report obstructive

9    vegetation and that Defendants' arguments otherwise go to the weight of the evidence. (Pls.'

10   Resp. at 23-24.)

11   The Court agrees with Plaintiffs. Defendant Matlock testified that he was not trained to

12   report vegetation that obstructed his view of approaching motorists nor trained to report

13   vegetation that obstructed motorists' view of the train. (*See* Gill Decl., Ex. 1 at 13; Sanders

14   Decl., Ex. 4 (Matlock Dep. at 42:24-43:25, 44:8-21).) Ms. Gill's reliance on Defendant's

15   Matlock's testimony in opining that Defendants failed to take sufficient action to control any

16   obstructive vegetation at the Crossing is adequately supported by sufficient facts. *See* Fed. R.

17   Evid. 702(b). Whether Mr. Matlock was required to report any obstructive vegetation, or whether

18   his view was obscured, are also concerns that go to the weight of the evidence and may more

19   properly be explored by Defendants on cross-examination of Ms. Gill. Accordingly, the Court

20   finds that exclusion of this portion of Ms. Gill's opinion is not warranted.

## IV.    CONCLUSION

21   For the foregoing reasons, this Court GRANTS in part and DENIES in part Defendants'

22   Motion (dkt. # 77). Specifically, (1) Mr. Ogden's expert testimony is permitted, save for the

23   portion of his opinion concluding Defendants violated RCW 36.86.100 in this case; and (2) Ms.

ORDER -26

1   Gill's expert testimony is permitted, save for the portion of her opinion referencing unproduced

2   BNSF materials.

3        The Clerk is directed to send copies of this Order to the parties and to the Honorable

4   Benjamin H. Settle.

5        Dated this 16th day of November, 2021.

6

7   MICHELLE L. PETERSON
    United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER -27