UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TIM NAY, *et al.*,

                Plaintiffs,

      v.

BNSF RAILWAY COMPANY, *et al.*,

                Defendants.

Case No. C19-5425-BHS-MLP

REPORT AND RECOMMENDATION

## I.    INTRODUCTION

This matter is before the Court on Defendants BNSF Railway Company ("BNSF"), National Railroad Passenger Company (d/b/a/ Amtrak), Timothy Burch, and Thomas Matlock's Motion for Summary Judgment ("Defendants' Motion"). (Defs.' Mot. (dkt. # 71).) Defendants' Motion seeks summary judgment in their favor on claims by Plaintiffs Tim Nay, in his capacity as personal representative of the estate of Maria Gonzalez Torres ("Ms. Gonzalez Torres"), and Gregory Price, in his capacity as guardian ad litem of minor I.G., for wrongful death and survival arising from a BNSF and Amtrak ("Railroad Defendants") train collision that resulted in the death of Ms. Gonzalez Torres. (*Id.* at 1-2.) Plaintiffs oppose Defendants' Motion (Pls.' Resp. (dkt. # 86)) and Defendants filed a reply (Defs.' Reply (dkt. # 92)). Neither party requested oral argument.

REPORT AND RECOMMENDATION -1

Having considered the parties' submissions, the governing law, and the balance of the record, the Court recommends that Defendants' Motion (dkt. # 71) be GRANTED in part and DENIED in part, as further explained below.

## II.    BACKGROUND

### A.    Factual Background

Beginning in approximately May 2016, Ms. Gonzalez Torres and her employees began cleaning several houses located on Southwest 5th Avenue, in Camas, Washington. (Yates Decl. (dkt. # 72) at ¶ 2, Ex. A (dkt. # 72-1) at 4 (Tedoro Dep. at 15:4-16:13).) On May 16, 2017, at approximately 10 a.m., Ms. Gonzalez Torres drove her vehicle with her minor son I.G. in a southwest direction along Southwest Viola, a private road that connects to Southwest 5th Avenue, to reach one of the homes that she cleaned. (Am. Compl. (dkt. # 31) at ¶¶ 14, 18; Yates Decl. at ¶ 3, Ex. B (dkt. # 72-2) at 6; Young Decl. (dkt. # 75) at ¶¶ 9, 12, Ex. 5 (dkt. # 75-5) at 4.) At the intersection of Southwest 5th Avenue and Southwest Viola there is an at-grade, unguarded private railroad crossing ("the Crossing"), which allows for ingress and egress for homes located on Southwest 5th Avenue. (Am. Compl. at ¶¶ 19-20; Flynn Decl. (dkt. # 73) at ¶ 7, Ex. 2 (dkt. # 73-2) at 10); *see also* Heikkila Decl. (dkt. # 74) at ¶ 9, Ex. 2 (dkt. # 74-2) at 4, 8-9.)

As Ms. Gonzalez Torres drove along Southwest Viola, she eventually encountered the Crossing. (Am. Compl. at ¶ 15.) The Crossing did not have any active warnings, such as bells, flashing lights, or crossing arms, but did have a stop sign posted. (Am. Compl. at ¶¶ 18-20; Young Decl. at ¶¶ 9, 12, Ex. 5 at 4.).) On that day, the weather was "partly sunny," and the road was damp from a recent rain shower. (Young Decl. at ¶¶ 9, 12, Ex. 5 at 4.) Ms. Gonzalez Torres was speaking with her sister on a cellphone as she approached the Crossing. (Yates Decl. at ¶¶ 4-6, Ex. C (dkt. # 72-3) at 4-5 (I.G. Dep. at 78:5-25, 85:19-86:7), Ex. E (dkt. # 72-5) at 2.)

Ms. Gonzalez Torres did not have any hearing or visual impairments. (Yates Decl. at ¶ 3, Ex. B at 6.)

As Ms. Gonzalez Torres attempted to navigate the Crossing, her vehicle collided with a westbound Amtrak passenger train near the left front tire. (Am. Compl. at ¶ 16; Young Decl. at ¶¶ 9, 12 , Ex. 5 at 3.) Ms. Gonzalez Torres was declared dead at the scene, and I.G. was transported by ambulance to the hospital with minor physical injuries. (Young Decl. at ¶¶ 9, 12, Ex. 5 at 3.) Ms. Gonzalez Torres's vehicle did not come to a complete stop before entering the Crossing. (*Id.* at 5-9.) The crash data retrieval report from Ms. Gonzalez Torres's vehicle indicates she slowed from 16 miles per hour to three miles per hour in the last five seconds before the collision. (Young Decl. at ¶¶ 9-12, Ex. 4 (dkt. # 75-4) at 7, 13.)

Defendant Burch was the train's engineer, and Defendant Matlock was the train's assistant conductor. (Am. Compl. at ¶ 17.) Two or three seconds before the collision, Defendant Matlock sounded the train's horn because he saw Ms. Gonzalez Torres's vehicle approach the Crossing. (Yates Decl. at ¶ 9, Ex. H (dkt. # 72-8) at 5 (Matlock Dep. at 30:23-31:4).) Defendant Matlock applied the train's air braking system upon seeing Ms. Gonzalez Torres's vehicle.[1] (Yates Decl. at ¶¶ 8-9, Ex. G (dkt. # 72-7) at 2, Ex. H at 4 (Matlock Dep. at 27:17-28:7).) At the time of the collision, the train was traveling at approximately 70 miles per hour.[2] (Yates Decl. at

---

[1] To have avoid a collision at the Crossing, Defendants' expert Brian Heikkila opined that Defendant Matlock would have needed to "apply the emergency brakes approximately 1,495 feet prior to reaching [the Crossing] . . . However, at that point the train would have been more than 14 seconds away with no indication to the engineer of any need to take any such action." (*See* Heikkila Decl. (dkt. # 74) at ¶ 9, Ex. 2 (dkt. # 74-2) at 9.)

[2] Plaintiffs contend that Amtrak's Maintenance Analysis Program Condition Reports demonstrate that the speedometer was malfunctioning, and as such, the train violated the federal regulations and the Air Brake and Train Handling Rules by operating in excess of 20 miles per hour. (Pls.' Resp. at 4; Ogden Decl., Ex. 1 at 19.)

REPORT AND RECOMMENDATION -3

1    ¶¶ 8-9, Ex. G at 2, Ex. H at 4 (Matlock Dep. at 27:11-13); *see also* Heikkila Decl. at ¶ 9, Ex. 2 at

2    8.)

3          Ms. Gonzalez Torres regularly drove her employees to work locations in operating her

4    cleaning business. (Yates Decl. at ¶ 2, Ex. A at 5 (Tedoro Dep. at 18:23-25).) Ms. Gonzalez

5    Torres's cleaning employee, Martha Tedoro, testified that Ms. Gonzalez Torres was familiar

6    with the Crossing, had traveled across the railroad tracks several times, but that she never

7    stopped at the stop sign posted at the Crossing. (Yates Decl. at ¶ 2, Ex. A at 5 (Tedoro Dep. at

8    15:4-16:13, 19:3-10).) I.G. testified that he could not recall whether Ms. Gonzalez Torres ever

9    stopped at the stop sign at the Crossing. (Yates Decl. at ¶ 4, Ex. C (I.G. Dep. at 75:25-2,

10   79:5-7).)

11         The Clark County Sheriff's Office ("CCSO") investigated the scene of the accident,

12   analyzing event recorder data from Ms. Gonzalez Torres's vehicle and video footage from the

13   Amtrak train. (Young Decl. at ¶¶ 9, 12, Ex. 5 at 3-11.) Per the CCSO report, there were two stop

14   signs posted prior to the Crossing. (Young Decl. at ¶¶ 9, 12, Ex. 5 at 4.) The first sign was a

15   private sign posted on the east side of Southwest Viola about 25 feet north of the railroad tracks

16   that read, "Stop Proceed with Caution." (*Id.*) The second sign was a traditional stop sign posted

17   by Railroad Defendants on the west side of Southwest Viola approximately 10 feet north of the

18   railroad tracks. (*Id.*)

19         In the course of the CCSO investigation, Detective Young took photographs of the

20   railroad tracks from the vantage point of where a driver is required to stop at the traditional stop

21   sign on Southwest Viola Street at the Crossing. (Young Decl. at ¶¶ 5, 7, Ex. 2 at 2, Ex. 3 (dkt.

22   # 75-3) at 2.) The CCSO report noted that the "railroad tracks run east west and are straight and

23   level with excellent sight distance. At the crossing on [Southwest] Viola looking east I measured

REPORT AND RECOMMENDATION -4

1   the sight distance is approximately a half a mile . . . ." (Young Decl. at ¶ 9, 12, Ex. 5 at 4.) The

2   report additionally notes that, per review of video from the train, that the train's horn was

3   sounded, and that the emergency braking system was engaged once Ms. Gonzalez Torres's

4   vehicle entered the Crossing. (*Id.* at 5.)

5          The CCSO investigation ultimately concluded that Ms. Gonzalez Torres failed to stop at

6   the stop sign located at the Crossing. (Young Decl. at ¶¶ 9-12, Ex. 5 at 5-9; Payne Decl. (dkt.

7   # 76) at ¶ 12.) Based on the CCSO's investigation, the event data recorder, and video from the

8   train, the CCSO determined that Ms. Gonzalez Torres's failure to stop at the posted stop sign

9   resulted in her being "the proximate cause of the collision event." (Young Decl. at ¶¶ 9, 12, Ex. 5

10  at 11.)

11         **B.     Expert Reports**

12              *i.     Plaintiffs' Experts*

13         Due to the nature of the accident, Plaintiffs engaged Brandon Ogden, a railway

14  operations consultant, and Joellen Gill, a human-factors engineering consultant, to provide expert

15  testimony regarding Railroad Defendants train operations and rule interpretations. (Order (dkt.

16  # 95) at 2; *see also* Pls.' Resp. at 1-4.) The parties are familiar with the facts pertaining to both

17  Mr. Ogden and Ms. Gill's expert testimonies and this Court has previously laid out the

18  background of both Mr. Ogden and Ms. Gill's expert reports in detail in its previous Order on

19  Defendants' Motion to Strike Expert Disclosures and Proposed Testimonies.[3] (*See* Order (dkt.

20  # 95) at 2-7.)

21

22  ─────────────────────────
    [3] As a result of the Court's previous Order, the Court found that: (1) Mr. Ogden's expert testimony was
    permitted in full, save for the portion of his opinion concluding Defendants violated RCW 36.86.100; and

23  (2) Ms. Gill's expert testimony was permitted in full, save for the portion of her opinion referencing any
    unproduced BNSF materials. (Order (dkt. # 95) at 26-27.) Neither party filed objections to the Court's
    previous Order.

1    In summary, and relevant to the instant matter, Mr. Ogden's expert report concluded that

2    Railroad Defendants: (1) failed to give a proper audible warning at the Crossing because

3    Defendant Matlock did not blow the horn until about a second prior to the collision and there

4    were no active or audible warning devices at the Crossing, (2) provided an improper visual

5    warning due to impaired sight distances at the Crossing; and (3) allowed several dangerous and

6    hazardous conditions to exist at the Crossing. (Ogden Decl. (dkt. # 89) at ¶ 2, Ex. 1 (dkt. # 89-1)

7    at 7, 10.) Mr. Ogden additionally found that Defendants violated federal regulations, their own

8    operating rules, and industry standards of care in operating the train over the Crossing. (*Id.* at

9    19-27.) Ms. Gill's expert report documented several system design factors of Railroad

10   Defendants' safety or risk management program for the Crossing. (Gill Decl. (dkt. # 88) at ¶ 2,

11   Ex. 1 (dkt. # 88-1) at 5, 11.) Ms. Gill concluded that the Crossing was "extremely dangerous for

12   drivers," that Railroad Defendants should have known of the conditions at the Crossing before

13   Ms. Gonzalez Torres's collision, and that Railroad Defendants' failures to remedy the conditions

14   at the Crossing were "gross violations" of safety and risk management. (*Id.*)

15           *ii.    Defendants' Experts*

16   Defendants secured James Flynn, a consulting engineer with experience in vehicular

17   accident reconstruction, and Brian Heikkila, a railroad consultant, to provide expert reports on

18   Ms. Gonzalez Torres's collision. (Flynn Decl. at ¶¶ 2, 6-7, Ex. 2 at 1-13; Heikkila Decl. at ¶¶ 1,

19   9, Ex. 2 at 1-14.)

20           1.    <u>James Flynn</u>

21   Mr. Flynn has worked as a consulting engineer since 1985 and has provided expert

22   testimony in over 100 cases in state and federal court. (Flynn Decl. at ¶¶ 2-5, Ex. 1 (dkt. # 73-1)

23   at 3.) Mr. Flynn has previously published papers, delivered presentations, and attended scientific

meetings on vehicular accident reconstruction and collision analysis. (*Id.* at ¶ 3; *see id.*, Ex. 1 at 2-12.)

Per his expert report, Mr. Flynn found that the presence of the Crossing, and the requirement for drivers to stop at the stop signs located at the Crossing, were "unambiguous" for motorists traveling on Southwest Viola street toward the Crossing. (Flynn Decl. at ¶ 7, Ex. 2 at 2.) Mr. Flynn opined that a motorist who brought their vehicle to a stop at the posted stop sign would have a clear and unobstructed view of east and westbound trains approaching the Crossing. (*Id.*) In coming to his conclusion, Mr. Flynn cited the CCSO's report on the collision, contemporaneous photos that were taken by the investigating officers at the scene of the accident, and a video recording from the vantage point of a motorist if they stopped at the stop sign at the Crossing. (*Id.* at 3-4.) Mr. Flynn further noted that the deposition testimony of Ms. Tedoro and I.G. acknowledged that Ms. Gonzalez Torres was aware of the stop sign at the Crossing but had previously failed to come to a complete stop in her prior encounters, and that she was likely distracted because she was on the phone as she approached the Crossing. (*Id.* at 5-6.)

Mr. Flynn's report also contained an analysis of event data recorder information from Ms. Gonzalez Torres's vehicle and video from the train's perspective of the collision. (Flynn Decl. at ¶ 7, Ex. 2 at 6-7.) Based on his review, Mr. Flynn concluded Ms. Gonzalez Torres failed to bring her vehicle to a complete stop before the stop sign at the Crossing, and due to that failure, there was no way for Defendant Matlock to avoid a collision. (*Id.*) In sum, Mr. Flynn opined that based on his review of the record, the Crossing was safe when used as intended and that he concurred with the CCSO's finding that the proximate cause of the collision was Ms. Gonzalez Torres's failure to stop at the stop sign before the Crossing. (*Id.* at 12-13.)

1        2.    <u>Brian Heikkila</u>

2        Mr. Heikkila has worked as a railroad consultant since 2000 and has worked in railroad

3    operations in various capacities with several railroads, including BNSF, since 1969. (Heikkila

4    Decl. at ¶¶ 1-6, Ex. 1 (dkt. # 74-1) at 2-4.) Mr. Heikkila has previously investigated several

5    railroad accidents and incidents and has previously qualified to testify as an expert witness in the

6    area of railroad safety, training, rules, operating practices, and mechanical matters in federal and

7    state court. (*Id.* at ¶ 9, Ex. 2 at 2.)

8        Per his expert report, Mr. Heikkila opined that the train would have been visible to Ms.

9    Gonzalez Torres had she stopped at the stop sign at the Crossing and looked for train traffic

10   given the sight lines available to motorists approaching the Crossing. (Heikkila Decl. at ¶ 9, Ex.

11   2 at 7.) Mr. Heikkila noted that the train's speed complied with the railroad timetable speed limit

12   for the class of track. (*Id.* at 8.) Mr. Heikkila additionally noted that, per federal regulations and

13   Railroad Defendants operating rules, the train's horn did not need to be sounded on approach

14   because the Crossing was a private grade crossing. (*Id.* at 8-9.) Finally, Mr. Heikkila found that

15   the train itself was highly conspicuous to motorists due to its height and illuminated headlights.

16   (*Id.* at 11.)

17       Mr. Heikkila determined that there was no way for Defendant Matlock to avoid the

18   collision because Ms. Gonzalez Torres failed to stop at the posted stop sign. (Heikkila Decl. at

19   ¶ 9, Ex. 2 at 8-9.) As a result, Mr. Heikkila concluded Defendant Matlock's actions were

20   appropriate given the unfolding events, consistent with the rules and standards of care in the

21   industry, and that Defendant Matlock did not cause or contribute to the accident. (*Id.* at 11, 13,

22   15.)

23

1

### C.     Plaintiffs' Claims

2      Per Plaintiffs' amended complaint, Plaintiffs argue that Defendants breached a duty to

3  exercise reasonable care to avoid injuring or killing members of the public in their operation of

4  trains over the Crossing. (Am. Compl. at ¶ 21.) Plaintiffs argue that Defendants breached their

5  duty by failing to exercise reasonable care in the operation of trains over the Crossing, by failing

6  to properly maintain the Crossing, and by failing to provide adequate warning of the approaching

7  train. (*Id.* at ¶ 23.) Plaintiffs argue that all acts or omissions of Defendants constitute negligence,

8  gross negligence, willful and wanton conduct, recklessness, and intentional conduct, and

9  demonstrate a reckless and intentional disregard for the safety of the motoring public. (*Id.* at

10  ¶ 21.)

11      Specifically, Plaintiffs' claims are based on allegations that Defendants were negligent

12  and grossly negligent because Defendants: (1) provided inadequate audible warnings at the

13  Crossing, including failing to properly sound the train's whistle, siren, or horn; (2) provided

14  inadequate visual warnings at the Crossing, including failing to properly maintain an adequate,

15  unobstructed sight distance at the Crossing; (3) ignored known hazardous conditions that existed

16  at the Crossing due to Defendants' train operations, including exceeding the speed limit, and

17  failing to slow and/or stop the train in order to avoid a specific individual hazard; (4) failed to

18  identify, inspect, and repair hazardous conditions at the Crossing; (5) failed to require any

19  reporting of the unsafe conditions that existed at the Crossing; (6) failed to provide adequate

20  sign, signal devices, and warning devices at the Crossing, including failing to use any means of

21  active warning; and (7) failed to properly train, instruct, manage, or properly monitor Defendants

22  Burch and Matlock (collectively, "Train Crew Defendants"). (*See* Am. Compl. at ¶¶ 24-63.)

23

1    Plaintiffs' amended complaint requests economic and noneconomic damages for Ms.

2    Gonzalez Torres's estate as a result of her death. (Am. Compl. at ¶¶ 64-66.) Plaintiffs further

3    request damages for I.G. on account of his injuries, medical expenses, pain and suffering, and

4    loss of future earning capacity. (*Id.* at ¶¶ 66-72.)

5    **D.    Procedural Background**

6    On May 16, 2019, Plaintiffs filed their original complaint. (Compl. (dkt. # 1).) On May

7    21, 2019, this Court entered an order appointing Gregory Price as I.G.'s guardian ad litem. (Dkt.

8    # 15.) On November 27, 2019, this Court granted Plaintiffs leave to amend their complaint (dkt.

9    # 30) and Plaintiffs filed their amended complaint (Am. Compl. (dkt. # 31).) On January 30,

10   2020, Defendants filed their answer to Plaintiffs' amended complaint. (Defs.' Answer (dkt.

11   # 32).) From April 1, 2020, through June 14, 2021, this Court granted the parties' multiple

12   extensions of time to accommodate witness depositions throughout discovery. (Dkt. ## 37, 41,

13   45, 52, 67, 70.)

14   On August 23, 2021, Defendants filed their Motion. (Defs.' Mot.) On September 27,

15   2021, Plaintiffs filed a response to Defendants' Motion (dkt. # 86), and on October 1, 2021,

16   Defendants filed a reply (dkt. # 92). In addition to the instant Motion, as previously discussed

17   above, Defendants filed a Motion to Strike Expert Disclosures and Proposed Testimonies on

18   August 23, 2021. (Dkt. # 77.) On November 16, 2021, this Court entered an order granting in

19   part and denying in part Defendants' Motion to Strike. (Order (dkt. # 95).) This matter is now

20   ripe for the Court's review.

21   **III.    DISCUSSION**

22   Defendants argue that summary judgment in their favor is appropriate with respect to

23   Plaintiffs' claims on the basis that: (1) the Federal Railroad Safety Act ("FRSA") preempts

1   Plaintiffs' state-law claims; (2) Defendants did not breach a duty owed to Ms. Gonzalez Torres

2   that proximately caused the collision; and (3) Ms. Gonzalez Torres was the sole and proximate

3   cause of the collision at the Crossing due to her failure to stop. (Defs.' Mot at 1-2, 7-10.)

4   Plaintiffs counter that their claims are not preempted under the FRSA because the applicable

5   regulations do not cover Plaintiffs' claims, and that even where regulations did cover Plaintiffs'

6   claim, the FRSA does not preempt claims where the railroad violated either a federal standard of

7   care or an internal rule created pursuant to a federal regulation. (Pls.' Resp. at 10-11.) Plaintiffs

8   additionally contend that Ms. Gonzalez Torres's failure to stop at the Crossing was not the sole

9   proximate cause for the collision because she had no obligation to stop at the stop sign, the

10  train's visibility remains a jury question, and that Defendants breached a duty owed to Ms.

11  Gonzalez Torres by failing to exercise reasonable care in operating trains over the Crossing,

12  failing to properly maintain the Crossing, and by failing to provide adequate warning of

13  approaching trains at the Crossing. (*Id.* at 5-10.) The Court will examine the parties' arguments

14  in turn.

15          **A.      Summary Judgment Standard**

16          Summary judgment is appropriate when the "movant shows that there is no genuine

17  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

18  Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party is

19  entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

20  showing on an essential element of his case with respect to which he has the burden of proof.

21  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden

22  of showing the Court "that there is an absence of evidence to support the nonmoving party's

23  case." *Id.* at 325. The moving party can carry its initial burden by producing affirmative evidence

1  that negates an essential element of the nonmovant's case or by establishing that the nonmovant

2  lacks the quantum of evidence needed to satisfy its burden at trial. *Nissan Fire & Marine Ins.*

3  *Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the

4  nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v.*

5  *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in

6  favor of the nonmoving party. *Id.* at 585-87.

7      Genuine disputes are those for which the evidence is such that a "reasonable jury could

8  return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257. It is the nonmoving party's

9  responsibility to "identify with reasonable particularity the evidence that precludes summary

10  judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoted source omitted). The

11  Court need not "scour the record in search of a genuine issue of triable fact." *Id.* (quoted source

12  omitted); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but

13  it may consider other materials in the record."). Nor can the nonmoving party "defeat summary

14  judgment with allegations in the complaint, or with unsupported conjecture or conclusory

15  statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003); *see*

16  *McElyea v. Babbitt*, 833 F.2d 196, 197-98 n.1 (9th Cir. 1987) (per curiam).

17      **B.    Federal Preemption**

18      Congress enacted the FRSA to promote "safety in every area of railroad operations and

19  reduce railroad-related accidents and incidents." *Norfolk Southern Ry. Co. v. Shanklin*, 529 U.S.

20  344, 347 (2000) (quoting 49 U.S.C. § 20101). The FRSA contains an express preemption

21  provision noting that "laws, regulations, and orders related to railroad safety and laws,

22  regulations and orders related to railroad security shall be nationally uniform to the extent

23  practicable" and preempts state authority to adopt safety rules. 49 U.S.C. § 20106(a)(1); *see also*

1    *Union Pac. R.R. Co. v. Cal. Pub. Util. Comm'n*, 346 F.3d 851, 858 (9th Cir. 2003) (citations

2    omitted). The FRSA allows the Secretary of Transportation ("Secretary") to "prescribe

3    regulations and issue orders for every area of railroad safety." *Id.* (quoting 49 U.S.C.

4    § 20103(a)). As a result, the Secretary, acting through the Federal Railroad Administration

5    ("FRA"), has promulgated regulations covering track safety standards. *See generally* 49 C.F.R.

6    § 213.

7            The preemptive effect of the Secretary's regulations is governed by § 20106, which

8    contains two savings clauses allowing states to adopt railroad safety rules. *Union Pac.*, 346 F.3d

9    at 858. Under the first clause, states are permitted to adopt railroad regulations until the

10   Secretary, with respect to railroad safety matters, "prescribes a regulation or issues an order

11   covering the subject matter of the State requirement." *Id.* (quoting 49 U.S.C. § 20106(a)(2)). For

12   an FRSA regulation to "cover" a state-law claim, a party must establish more than that the

13   regulation "touches upon" or "relates to" that subject matter; the party must demonstrate that

14   "the federal regulations substantially subsume the subject matter" of the claim. *CSX Transp., Inc.*

15   *v. Easterwood*, 507 U.S. 658, 664 (1993); *see also Shanklin*, 529 U.S. at 352. However, if the

16   Secretary has "covered" the subject matter states may adopt more stringent railroad regulation

17   under the second clause where the regulation: "(1) is necessary to eliminate or reduce an

18   essentially local safety . . . hazard; (2) is not incompatible with a law, regulation, or order of the

19   United States Government; and (3) does not unreasonably burden interstate commerce."[4] *Union*

20   *Pac.*, 346 F.3d at 858 (quoting 49 U.S.C. § 20106(a)(2)). "It is the burden of the party advocating

21   preemption under § 20106(a)(2) to show that a federal law, regulation, or order covers the same

22

23

---

[4] The United States Supreme Court has previously held that duties imposed by railroads under state common law can also be preempted under the FRSA. *Easterwood,* 507 U.S. at 664.

REPORT AND RECOMMENDATION -13

1    subject matter as the state law, regulation, or order it seeks to preempt." *Duluth, Winnipeg &*
2    *Pac. Ry. Co. v. City of Orr*, 529 F.3d 794, 797 (8th Cir. 2008).

3        In 2007, Congress amended 49 U.S.C. § 20106 to note that it did not "preempt an action
4    under State law seeking damages for personal injury, death, or property damage" under certain
5    conditions. 49 U.S.C. § 20106(b); *see also Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1214
6    (10th Cir. 2008). As a result, § 20106(b) additionally permits state-law actions for claims based
7    on a failure to comply with: (1) "the Federal standard of care established by a regulation or order
8    issued by the [Secretary]"; (2) a party's "own plan, rule, or standard that it created pursuant to a
9    regulation or order issued by either of the Secretaries"; or (3) a State standard otherwise
10   permitted by § 20106(a)(2). 49 U.S.C. § 20106(b). Nevertheless, "[t]he 2007 amendment is
11   narrow in scope; it was designed to preserve state law causes of action where railroads were not
12   in compliance with federal law." *Veit, ex rel. Nelson v. BNSF*, 171 Wash.2d 88, 114 (2011)
13   (citing *Murrell v. Union Pac. R.R. Co.*, 544 F.Supp.2d 1138, 1148 (D. Or. 2008)). Similarly, 49
14   U.S.C. § 20106(b) "does not save *all* state law claims based on internal rules and
15   standards . . . only those claims based on a 'plan, rule, or standard *that it created pursuant to a*
16   *regulation or order issued by either of the Secretaries.*'" *Id.* (emphasis in original).

17       For the reasons explained below, the Court finds that some, but not all, of Plaintiffs'
18   claims are preempted under the FRSA.

19               i.    *Train Operations Claims*

20                    1.    <u>Audible Warning</u>

21       Plaintiffs advance several claims regarding the sounding of the train's horn and that
22   Defendants failed to give a proper audible warning of the train's approach. (Am. Compl. at
23   ¶¶ 24-31.) Specifically, Plaintiffs' amended complaint alleges that: (1) the horn was not properly

1   sounded—blown in the correct sequence for a specific duration—when approaching the

2   Crossing; (2) that the horn was sounded improperly given the nature of the "specific, individual

3   hazard" present at the Crossing; and (3) that the train horn failed to meet federal audibility

4   requirements. (*Id.*)

5          Federal regulations regarding the sounding of a train horn do not generally apply

6   to trains approaching a private highway-rail grade crossing.[5] 49 C.F.R. § 222.25.

7   However, where "state law requires the sounding of a locomotive horn at private

8   highway-rail grade crossings, the locomotive horn shall be sounded in accordance with

9   [49 C.F.R.] § 222.21 . . . ." *Id.*; *see also* 49 C.F.R. § 222.21 (providing that a train horn

10  must be sounded with two long blasts, one short blast, and one long blast between 15 and

11  20 seconds before approaching a public highway-rail grade crossing and shall be repeated

12  or prolonged as necessary).

13         Plaintiffs argue that, pursuant to 49 C.F.R. § 222.25, the FRSA does not preempt their

14  claim that the horn should have been sounded at the Crossing. (Pls.' Resp. at 11-14.) Plaintiffs

15  argue that Washington common law requires that a train's horn be sounded at private crossings

16  under certain circumstances and such circumstances existed because the Crossing was dangerous

17  given its condition. (*Id.* at 13 (citing *Ploegman v. BNSF Ry. Co.*, 112 Wash. App. 1001 (Wash.

18  App. Div. I 2002)). Defendants counter that Plaintiffs fail to cite any precedential or persuasive

19  Washington law requiring that the train's horn be sounded at the Crossing because *Ploegman* is

20  an unpublished Washington Court of Appeals decision. (Defs.' Reply at 4-5.)

21

22

23

---

[5] Per 49 C.F.R. § 222.9, a "private highway-rail grade crossing" is a highway-rail grade crossing that is not a public highway-rail grade crossing. A "public highway-rail grade crossing" is defined as "a location where a public highway, road, or street, including associated sidewalks or pathways, crosses one or more railroad tracks at grade." 49 C.F.R. § 222.9.

REPORT AND RECOMMENDATION -15

1    On this issue, the parties do not dispute that the Crossing is a private at-grade crossing.

2  (*See* Am. Compl. ¶¶ 19-20, 60; Defs.' Mot. at 1, 15.) Therefore, pursuant to 49 C.F.R. § 222.25,

3  the train's horn was not required to be sounded in a particular manner for a particular duration

4  prior entering the Crossing absent a requirement under Washington state law. Plaintiffs cite to

5  *Ploegman* for such a requirement. However, Washington General Rule 14.1 provides that

6  unpublished opinions of the Washington Court of Appeals have no precedential value and are not

7  binding upon any court.[6] The rule permits citations to unpublished Washington Court of Appeals

8  decisions only if these cases were decided on or after March 1, 2013. *Spesock v. U.S. Bank, N.A.*,

9  2018 WL 4613163, at *5 n.8 (W.D. Wash. Sept. 26, 2018) ("[U]npublished opinions of the

10  [Washington] Court of Appeals filed on or after March 1, 2013, may be cited as non-binding

11  authorities . . . and may be accorded such persuasive value as the Court deems appropriate.").

12    Here, *Ploegman* was published in 2002, and thus is not binding or precedential authority

13  on this Court. Plaintiffs have not cited any additional authority demonstrating a Washington

14  common law requirement to sound a horn at a private crossing. Nevertheless, the Court notes that

15  *Ploegman* primarily relies on *Mulkey v. Spokane, Portland & Seattle Ry. Co.*, 65 Wash.2d 116,

16  123 (1964), a published Washington Supreme Court decision. In *Mulkey*, the Washington

17  Supreme Court held it was negligence as a matter of law for a train to fail to sound a warning at

18  a private crossing at issue in that case. 65 Wash.2d at 123. The trial court in *Mulkey* instructed

19  the jury that failure to sound a whistle and bell at the subject private crossing was negligence as a

20  matter of law based on the effect of RCW 81.48.010, which previously made it a misdemeanor

21

22  [6] While Washington General Rule 14.1 is not binding in federal court, this Court follows GR 14.1 as a
matter of comity. *Cont'l W. Ins. Co. v. Costco Wholesale Corp.*, 2011 WL 3583226, at *4 (W.D. Wash.

23  Aug. 15, 2011) ("Because Washington courts have made the judgment that 'unpublished' state court
decisions should not shape their decisions, this court follows their lead.").

REPORT AND RECOMMENDATION -16

for a train engineer to fail to sound a warning when crossing a "traveled road or street."[7] However, the trial court later vacated the verdict because "[t]he trial judge became convinced that [RCW 81.48.010] did not apply to private roadways . . . and that it was error to charge that a violation of the statutory requirement was negligence as a matter of law." *Mulkey*, 65 Wash.2d at 123. Pertinent to the instant matter, the Washington Supreme Court held, regardless of the applicability of RCW 81.48.010 to private crossings, that a common-law duty to warn can exist at private crossings under certain circumstances. [8] *Id.* Specifically, the Washington Supreme Court found that "[t]he adequacy of the defendant's warning must be determined from the circumstances relative to [the] particular road at [the] particular time and under [the] particular circumstances . . . ." *Id.*

Plaintiffs have set forth evidence in the record that the conditions of the Crossing made it innately dangerous and warranted that the train's horn be sounded. (*See* Ogden Decl. at ¶ 2, Ex. 1 at 6, 23-24; Gill Decl. at ¶ 2, Ex. 1 at 5-11.) Moreover, Defendants' cited authority under *Marsh v. Norfolk Southern, Inc.*, 243 F.Supp.3d 557 (M.D. Penn 2017) and *Lopez v. CSX Transportation, Inc.*, 269 F.Supp.3d 668 (W.D. Pa. 2017) that Defendant Matlock had no legal duty to sound the horn at the Crossing is inapposite. Both of those cases concerned the duty to sound the horn in an emergency situation under 49 C.F.R. § 222.23. *See Marsh*, 243 F.Supp.3d at 572; *Lopez*, 269 F.Supp.3d at 683-84. Here, Plaintiffs' claims instead assert that the horn should have been sounded at the Crossing pursuant to 49 C.F.R. § 222.25 because it was a dangerous

---

[7] RCW 81.48.010 was repealed by the Washington State Legislature in 2007. RCW 81.48.010, *repealed by* Laws 2007, ch. 234, § 102, eff. July 22, 2007.

[8] The Washington Supreme Court found that the circumstances relative to the subject crossing made it negligence as a matter of law for the engine crew to fail to sound a warning "whether or not [RCW 81.48.010] was applicable." *Mulkey*, 65 Wash.2d at 123.

REPORT AND RECOMMENDATION -17

1   private crossing regardless of any emergency circumstances presented by Ms. Gonzales Torres's

2   vehicle.[9]

3          The Court finds that whether the train's horn should have been sounded in a particular

4   manner, pattern, or for a specific duration, prior to entering the Crossing remains an issue for the

5   jury's determination under Washington common law. Plaintiffs' train horn claims are not

6   preempted under the FRSA.

7                              2.    Excessive Speed

8          Plaintiffs next allege that the train was traveling at a speed in excess of the track speed

9   limit. (Am. Compl. at ¶ 39.) Plaintiffs argue that Defendants violated 49 C.F.R. § 229.117 and

10  Defendants' Air Brake and Train Handling Rule 101.11, which both required the train to reduce

11  its speed to 20 miles per hour because the train's speedometer was faulty.[10] (Pls.' Resp. at 14-16

12  (citing 49 C.F.R. § 229.117 and Air Brake and Train Handling Rule 101.11).) Defendants argue

13

---

14  [9] In emergency situations, 49 C.F.R. § 222.23 places it in the "locomotive engineer's sole
    judgment" whether to sound the horn but creates "no legal duty" to do so. 49 C.F.R. § 222.23; *see
    also Lopez v. CSX Transportation, Inc.*, 269 F.Supp.3d 668, 683-84 (W.D. Pa. 2017) ("The
15  regulation expressly states that it does not impose a duty to sound the horn in emergency
    situations.").

16  [10] Pursuant to 49 C.F.R. § 229.117:

17          (a) After December 31, 1980, each locomotive used as a controlling locomotive at speeds
            in excess of 20 miles per hour shall be equipped with a speed indicator which is -

18          (1) Accurate within ± 3 miles per hour of actual speed at speeds of 10 to
            30 miles per hour and accurate within ± 5 miles per hour at speeds above
19          30 miles per hour; and

            (2) Clearly readable from the engineer's normal position under all light
20          conditions.

21          (b) Each speed indicator required shall be tested as soon as possible after departure by
            means of speed test sections or equivalent procedures.

22  Air Brake and Train Handling Rule 101.11 provides that if "a speed indicator on a controlling locomotive
    fails in route, the locomotive may continue as a controlling locomotive at normal track speed only to the
23  next facility where repairs can be made or until the locomotive is due a daily inspection, whichever occurs
    first," and that movement "beyond a facility where repairs can be made or location where daily inspection
    was conducted must not exceed 20 miles per hour." (Ogden Decl. at ¶ 2, Ex. 1 at 42-43.)

REPORT AND RECOMMENDATION -18

1    that because it is undisputed that the train was traveling within the statutory track speed limit,

2    any claims based on excessive speed must be dismissed as preempted. (Defs.' Mot. at 11-12.)

3         The FRSA has established regulations setting the maximum train speeds for different

4    classes of track. 49 C.F.R. § 213.9. In *Easterwood*, the United States Supreme Court held that the

5    FRSA's express preemption clause preempts common law tort claims regarding excessive

6    speed. 507 U.S. at 675. The Court explained that 49 C.F.R. § 213.9 covers the subject matter of

7    train speed, and thus, § 213.9 substantially subsumes relevant state law as to claims based on

8    train speed. *Id.* As a result, the Supreme Court held § 213.9 preempted the plaintiff's common

9    law negligence claims for excessive speed. *Id.* at 675-76. Generally, since *Easterwood*, "if the

10   train was traveling within the federal speed limit, then the FRSA preempts any state or common

11   law claim as to excessive speed." *Peters v. Union Pac. R.R. Co.*, 455 F.Supp.2d 998, 1002 (W.D.

12   Mo. 2006) (citing *Easterwood*, 507 U.S. at 675)*; see e.g.*, *Hesling v. CSX Transp., Inc.*, 396 F.3d

13   632, 638 (5th Cir. 2005) (finding FRSA preempted excessive speed claim based on violation of

14   self-imposed speed limit); *see also Veit*, 171 Wash.2d at 103-04 (collecting cases rejecting

15   excessive speed claims where railroads exceeded internal speed limits under *Easterwood*).

16        Here, Plaintiffs' excessive speed claims are preempted. As previously noted, the Crossing

17   was on a section of track rated as Class 4. (*See* Heikkila Decl. at ¶ 9, Ex. 2 at 8.) Class 4 track

18   has a maximum allowable speed of 80 miles per hour for passenger trains. 49 C.F.R. § 213.9.

19   The maximum speed for passenger trains under BNSF's timetable is 70 miles per hour. (Yates

20   Decl. at ¶ 7, Ex. F (dkt. # 72-5) at 3.) Although there is some evidence in the record that the

21   speedometer was malfunctioning, it is undisputed by the parties that the train operated at 70

22   miles per hour and followed the maximum speed limit for the track location at the time of the

23

REPORT AND RECOMMENDATION -19

collision at the Crossing.[11] (*See* Yates Decl. at ¶¶ 2, 8-9, Ex. A (Ogden Dep. at 126:2-7 ("Given the fact that the event recorder shows that the train was going 70 miles per hour, I don't believe that the engineer was speeding over the maximum authorized speed."), 127:5-8 ("I think given – given that the event recorder shows the train was going 70 miles per hour, I believe the engineer was in compliance with the maximum authorized speed for the territory."), Ex. G at 2, Ex. H at 4 (Matlock Dep. at 27:11-13).) Because the train was traveling within the allowable track speed per 49 C.F.R. § 213.9, any speed-related claim is preempted by the FRSA. *See e.g.*, *Murrell*, 544 F.Supp.2d at 1150-51 (applying federal regulations and railroads speed timetable in finding excessive speed claims preempted); *Hesling*, 396 F.3d at 638 ("Because Amtrak maintained its train speed well within the speed ratings promulgated by the FRA, the magistrate judge did not abuse his discretion in finding that [plaintiff's] excessive speed claims are preempted by federal law."); *see also Singh v. Nat'l R.R. Passenger Corp.*, 2018 WL 3407598, at *4 (N.D. Cal. June 4, 2018), *aff'd*, 799 F. App'x. 516 (9th Cir. 2020) ("As the train was traveling under the maximum allowable speed, Plaintiffs' claims based on train speed are not actionable.").

Accordingly, the Court finds that Plaintiffs' claims based upon excessive train speed preempted.

### 3.    Slow Order

Plaintiffs' amended complaint alleges that the area around the Crossing should have been protected by a "slow order." (Am. Compl. at ¶ 40.) Defendants argue that because a "slow order"

---

[11] Based on the record before the Court, per the train's maintenance reports, it appears that one engineer noted on May 14, 2017, that the speedometer fluctuated between 76 miles per hour and 82 miles per hour at 79 miles per hour and that there was no light on the speed indicator. (Ogden Decl. at ¶ 2, Ex. 1 at 40; Yates Decl. at ¶ 16, Ex. O (Ogden Dep. at 130:11-24).) Another engineer indicated on May 15, 2017, that the speedometer was "erratic" and "swings five miles per hour." (Ogden Decl. at ¶ 2, Ex. 1 at 41.)

1    was not issued by a FRA track inspector for the section of track at the Crossing, Plaintiffs' claim

2    is preempted. (Defs.' Mot. at 12.)

3        Although the Supreme Court in *Easterwood* found that excessive speed claims are

4    preempted, the Court noted that "related tort law duties, such as the duty to slow or stop a train to

5    avoid a specific, individual hazard" might not be preempted. 507 U.S. at 675 n.15. "Federal law

6    leaves the decision to issue a 'slow order' to an FRA inspector, as designated by the

7    requirements set forth in 49 C.F.R. § 213.7." *Murrell*, 544 F.Supp.2d at 1151-52; *see also* 49

8    C.F.R. § 216.15(a) ("When a FRA track inspector . . . determines the track does not comply with

9    the requirements of the class at which the track is being operated, . . . he notifies the railroad in

10    writing that the track is being lowered in class . . . .").

11        On this issue, Plaintiffs have failed to identify any evidence that a FRA inspector issued a

12    slow order—or should have issued a slow order—for the section of track at the Crossing where

13    the incident occurred. (*See* Pls.' Resp.) In fact, Plaintiffs' Response failed to address Defendants'

14    argument that this claim is preempted. (*See id.*) Because there is no evidence in the record that a

15    FRA inspector issued a slow order for the section of track where the collision occurred, or that

16    Defendants failed to comply with the alleged slow order, the Court finds that Plaintiffs' slow

17    order claim is preempted.

18            *ii.*    *Crossing Conditions*

19        Next, Plaintiffs bring a series of claims related to allegedly dangerous conditions that

20    existed at the Crossing. (Am. Compl. at ¶¶ 24-63.) The Court will examine each of these claims

21    in turn:

22

23

1.    Warning Devices

Plaintiffs' amended complaint alleges that Defendants breached their duty to install adequate active warning devices. (Am. Compl. ¶¶ 54-56.) Defendants argue that Plaintiffs' warning devices claim is preempted by the FRSA because the warning devices provided complied with federal law. (Defs.' Mot. at 20.) Plaintiffs counter that Defendants failed to meet their burden of establishing federal funds were used at the Crossing for FRSA preemption. (Pls.' Resp. at 16-18.)

In *Shanklin*, the Supreme Court addressed whether the FRSA, by virtue of 23 C.F.R. §§ 646.214(b)(3) and (4), preempts state tort claims concerning a railroad's failure to maintain adequate warning devices at crossings where federal funds have participated in the installation of such devices.[12] 529 U.S. 344, 551 (2000). The Supreme Court found that 23 C.F.R.

---

[12] Pursuant to 23 C.F.R. § 646.214(b)(3)-(4):

(3)(i) *Adequate warning devices,* under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:

(A)    Multiple main line railroad tracks.

(B)    Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.

(C)    High Speed train operation combined with limited sight distance at either single or multiple track crossings.

(D)    A combination of high speeds and moderately high volumes of highway and railroad traffic.

(E)    Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.

(F)    A diagnostic team recommends them.

REPORT AND RECOMMENDATION -22

1   §§ 646.214(b)(3)-(4) only have preemptive effect if the warning devices were installed with

2   federal funds. *Id.* at 352-54.

3        Here, as noted by Plaintiffs, there is no evidence in the record demonstrating that federal

4   funds participated in the installation of the warning devices located at the Crossing for FRSA

5   preemption. Defendants argue that this issue is a red herring due to Ms. Gonzalez's Torres's

6   failure to stop at the posted stop sign and because the Crossing had the necessary warning

7   devices to comply with BNSF's standard plan for private crossings. (Defs.' Reply at 6 (citing

8   Ogden Decl., Ex. 1 at 19).) But whether federal funds participated in the installation of the

9   warning devices at the Crossing remains central to the Court's preemption analysis of a warning

10  devices claim under the FRSA. *See e.g.*, *Lee v. BNSF Ry. Co.*, 245 F.3d 1102, 1105-07 (9th Cir.

11  2001) (holding that preemption of an inadequate warning device claim is only established when

12  the Federal Highway Administration approves a railroad crossing improvement project and a

13  state installs the warning device using federal funds); *Peters*, 455 F.Supp.2d at 1004 (holding

14  that the only FRSA regulations pertaining to warning signs with preemptive effect are 23 C.F.R.

15  § 646.214(b)(3) and (4), and such regulations only have preemptive effect if the warning devices

16  were installed with federal funds). The Court cannot conclude as a matter of law that 23 C.F.R.

17  § 646.214 clearly applies and the inadequate warning device claims are preempted.

18       The Court finds that Defendants have failed to demonstrate that federal funds were

19  utilized in the installation of any warning devices present at the Crossing for FRSA preemption.

20

21       (ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA may find that the above requirements are not applicable.

22       (4) For crossings where the requirements of §646.214(b)(3) are not applicable, the type of

23  warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.

REPORT AND RECOMMENDATION -23

1    At the very least, there is a dispute as to the expenditure of federal funds. Therefore, Plaintiffs'

2    claims that Defendants breached their duty to install active warning devices are not preempted.

3                                    2.    <u>Visual Obstruction</u>

4           Plaintiffs' amended complaint alleges that there were impaired sight distances, impaired

5    "sight triangles," and inadequate visual warnings at the Crossing to provide approaching drivers

6    with an unimpaired sight distance to determine the location of the Crossing, its condition, the

7    type of warning devices, and whether a train was approaching. (*See* Am. Compl. at ¶¶ 34-37.)

8    Plaintiffs allege that Defendant BNSF failed to clear visibility obstructions from its own right of

9    way to provide motorists with an adequate view down the track in both directions, and to the

10   extent visibility obstructions at the Crossing were off the railroad right-of-way, that BNSF

11   should have exercised reasonable care to work with adjoining landowners or the local road

12   authority to provide a safe crossing. (*Id.* at ¶¶ 35-36.) Defendants argue that this claim is

13   preempted under 49 C.F.R. § 213.37 as Plaintiffs' claims relates to vegetation on railroad

14   property that is on or immediately adjacent to the roadbed. (Defs.' Mot. at 19.)

15          Under 49 C.F.R. § 213.37, vegetation on railroad property which is on or immediately

16   adjacent to the tracks must be kept under control so that it does not obstruct visibility of railroad

17   signs and signals along the right-of-way.[13] "It is well established that 49 C.F.R.

18   _____

19   [13] Under 49 C.F.R. § 213.37, vegetation on railroad property which is on or immediately adjacent to
     roadbed shall be controlled so that it does not:

20      (a)  Become a fire hazard to track-carrying structures;

21      (b)  Obstruct visibility of railroad signs and signals:

22           (1)  Along the right-of-way, and

23           (2)  At highway-rail crossings; (This paragraph (b)(2) is applicable
                 September 21, 1999.)

REPORT AND RECOMMENDATION -24

1    § 213.37 preempts state regulation of vegetation on or immediately adjacent to the tracks."

2    *Peters*, 455 F.Supp.2d at 1003 (citing *Easterwood v. CSX Transportation, Inc.*, 933 F.2d 1548,

3    1554 (11th Cir. 1991), *aff'd,* 507 U.S. 658 (1993), and *Missouri Pac. R.R. Co. v. R.R. Comm'n of*

4    *Texas*, 833 F.2d 570, 577 (5th Cir. 1987)). Though § 213.37 preempts state-law claims

5    concerning vegetative growth on or immediately adjacent to the tracks, it does not "impose a

6    broader duty to control vegetation so that it does not obstruct a motorist's visibility of oncoming

7    trains." *Shanklin v. Norfolk S. Ry. Co.*, 369 F.3d 978, 987 (6th Cir. 2004) (quoting *O'Bannon v.*

8    *Union Pac. R.R. Co.*, 960 F.Supp. 1411, 1422-23 (W.D. Mo. 1997)). As such, courts have found

9    that state law claims alleging negligence in allowing vegetation to obscure sight lines at railroad

10   crossings are not preempted. *See Murrell*, 544 F.Supp.2d at 1154 (finding claims for failing to

11   provide adequate visibility not preempted under the FRSA); *Peters*, 455 F.Supp.2d at 1003

12   (finding that vegetation in crossing and right-of-way were not areas on or immediately adjacent

13   to tracks, and therefore, claims that they obstructed sight lines were not preempted by § 213.37).

14           On this issue, Plaintiffs have alleged that Defendants failed to clear visibility obstructions

15   at the Crossing from its own right-of-way to provide motorists with an adequate view down the

16   track in both directions. (Am. Compl. at ¶ 36.) Plaintiffs have not alleged that vegetation on or

17   immediately adjacent to the tracks was not properly maintained, but instead that vegetation

18   outside the area created visual obstructions. Because § 213.37 does not cover state common law

19   sight distance claims, the Court finds that Plaintiffs' claims that the Crossing and right-of-way

20

21           (c)  Interfere with railroad employees performing normal trackside duties;

22           (d)  Prevent proper functioning of signal and communication lines; or

23           (e)  Prevent railroad employees from visually inspecting moving equipment from their normal duty stations.

1    were not adequately free of vegetation is not preempted by the FRSA. *See Peters*, 455 F.Supp.2d

2    at 1003; s*ee also Shanklin*, 369 F.3d at 988; *Strozyk v. Norfolk Southern Corp.*, 358 F.3d 268,

3    276-77 (3d Cir. 2004).

4                    3.    <u>Track Inspection</u>

5        Plaintiffs allege that Defendants failed to inspect and repair the Crossing. (*See* Am.

6    Compl. at ¶¶ 44-45.) Plaintiffs allege that had Defendants properly conducted track inspections

7    at the Crossing, hazardous conditions that existed would have been identified and addressed prior

8    to Ms. Gonzalez Torres's collision. (*Id.* at ¶ 45.) Defendants argue that 49 C.F.R. §§ 213.1(a),

9    213.5(a), and 213.233 all govern track inspections, and therefore, Plaintiffs' track inspection

10   claim is preempted.[14] (Defs.' Mot. at 22.)

11       In Plaintiffs' Response, Plaintiffs contend that Defendants breached a duty to provide a

12   safe grade crossing, and therefore, their claims regarding a failure to inspect and repair the

13   Crossing are not preempted. (Pls.' Resp. at 20-21.) However, Plaintiffs' amended complaint

14   specifically refers to Defendants' alleged failure to conduct track inspections, and not grade

15   crossing inspections. (*See* Am. Compl. at ¶ 45 ("If BNSF would have properly conducted *track*

16   *inspections* at this crossing, the hazardous conditions at this crossing would have been identified

17   and remedial action taken long before this crash, thereby preventing this crash.") (emphasis

18   added).) Defendants have additionally set forth evidence that weekly track inspections were

19   performed at the Crossing, which Plaintiffs have failed to rebut. (Yates Decl. at ¶ 21, Ex. T

20   (Reaves Dep. (24:24-25:17).) Because Defendants have identified federal regulations governing

21

22

23   _____

[14] Section 213.233 sets forth several substantive requirements for how and when track shall be inspected.
Pertinent to the instant matter, § 213.233 requires Class 4 track to be inspected twice weekly with at least
one calendar day interval between inspections. 49 C.F.R. § 213.233(c).

1    track inspections that cover Plaintiffs' claim as pleaded in their amended complaint, the Court

2    finds Plaintiffs' track inspection claim preempted.

3                    *iii.    Failure to Train*

4            Plaintiffs claim that Defendants failed to report unsafe conditions that existed at the

5    Crossing and that this was in violation of federal regulations that require Railroad Defendants to

6    instruct Train Crew Defendants to comply with their own operating rules. (Am. Compl. at

7    ¶¶ 52-53.) Plaintiffs additionally allege that Defendants failed to instruct or otherwise provide

8    adequate training to the Train Crew Defendants. (Am. Compl. at ¶¶ 57-59.) Defendants argue

9    that Plaintiffs' allegations of failure to train are preempted under controlling federal

10   regulations.[15] (Defs.' Mot. at 23-24 (citing 49 C.F.R. §§ 217.1, 240.123, 242.1).) Plaintiffs

11   counter that 49 C.F.R. §§ 217.1, § 217.11, 217.9, and 218.11 set the federal standard of care as to

12   training, which Train Crew Defendants failed to comply with, in addition to violations of

13   Defendants' internal operating rules. (Pls.' Resp. at 21-22 (citing *Zimmerman v. Norfolk S.*

14   *Corp.*, 706 F.3d 170, 177-78 (3d Cir. 2013).) Therefore, Plaintiffs argue their claims are not

15   preempted. (*Id.*)

16           Section 240 specifies standards for the "eligibility, training, testing, certification and

17   monitoring of all locomotive engineers." 49 C.F.R. § 240.1(b). Pursuant to § 217, railroads must

18   periodically conduct operational tests and inspections to determine the extent of employees'

19

20   ───────────────
     [15] *See* 49 C.F.R. § 217.1 ("[E]ach railroad . . . shall periodically instruct each [ ] employee on the meaning
     and application of the railroad's operating rules in accordance with a written program . . . ."); 49 C.F.R.

21   § 240.123 ("A railroad shall provide for the continuing education of certified locomotive engineers to
     ensure that each engineer maintains the necessary knowledge, skills and ability concerning personal

22   safety, operating rules and practices, mechanical condition of equipment, methods of safe train
     handling. . . ."); 49 C.F.R. § 242.1(b) ("This part prescribes minimum Federal safety standards for the
     eligibility, training, testing, certification and monitoring of all conductors to whom it applies. This part

23   does not restrict a railroad from adopting and enforcing additional or more stringent requirements
     consistent with this part.").

compliance with its operating rules, timetables, and other special instructions. 49 C.F.R. § 217.9. The Ninth Circuit has previously held that §§ 217 and 240 "substantially subsume" the subject of railroad employee training. *Union Pac.*, 346 F.3d at 868 (citing *Easterwood*, 507 U.S. at 664). As a result, courts have routinely held that federal training regulations preempt state laws concerning employee training or negligence with respect to such training. *Id.*; *see also Marsh*, 243 F.Supp.3d at 570-71 (finding plaintiff's claims for failure to properly train, supervise, or instruct were preempted); *Carter v. Nat'l R.R. Passenger Corp.*, 63 F.Supp.3d 1118, 1155-56 (N.D. Cal. 2014).

On this claim, Plaintiffs do not dispute that Defendant Matlock was a certified locomotive engineer or that Defendant Burch was a certified conductor in accordance with the applicable FRA regulations. (*See* Pls.' Resp.) Instead, Plaintiffs submit as evidence of deficient training that Train Crew Defendants were not aware of requirements to test the train's speedometer or to reduce the train's speed, and that both Defendant Matlock and Burch testified that they do not blow the horn for private crossings. (*Id.* at 21-22.)

Although Plaintiffs allege that Train Crew Defendants' lack of awareness and actions breached federal regulations on railroad employee training, Plaintiffs' allegations fail to demonstrate how any of Railroad Defendants' certifications, training, policies, procedures, and practices violated the federal standards contained in 49 C.F.R. §§ 217, 218, and 240 or an internal rule created pursuant to those regulations. Plaintiffs must do more than make conclusory allegations to meet their burden in opposing summary judgment—they must come forward with evidence in support of their claim. *See Celotex Corp*, 477 U.S. at 323. As such, Plaintiffs have failed to establish that Railroad Defendants violated the applicable federal regulations governing the training of its employees. *See Nat'l R.R. Passenger Corp. v. Cimarron Crossing Feeders*,

2018 WL 5962876, at *38-39 (D. Kan. Nov. 14, 2018) (finding inadequate training allegations preempted under 49 C.F.R. §§ 217, 240, and 242, "which provide comprehensive and specific regulations as to train crew qualifications and training."); *Marsh*, 243 F.Supp.3d 557, 570-71 (finding failure to train claims preempted where plaintiff failed to demonstrate railroad's certifications, training, policies, procedures, and practices violated federal standards contained in 49 C.F.R. § 240); *see also BNSF Ry. Co. v. Doyle*, 186 F.3d 790, 796 (7th Cir. 1999).

Accordingly, the Court finds Plaintiffs' failure to train claims preempted.

       *iv.*    *Local Safety Hazard Exception*

Though the Court has found that some of Plaintiffs' claims are preempted under the FRSA, such claims may survive summary judgment if an "essentially local safety hazard" exists. *See* 49 U.S.C. § 20106(a)(2)(A); *Murrell*, 544 F.Supp.2d at 1156. To this point, Plaintiffs' amended complaint alleges that the conditions at the Crossing created "an essentially local safety hazard" and that the train crew was negligent when it failed to slow or stop the train to avoid a "specific individual hazard." (Am. Compl. at ¶¶ 39, 41-42.) Defendants argue that the Crossing presented neither condition and Plaintiffs have otherwise failed to demonstrate evidence of either condition. (Defs.' Mot. at 13-14, 23.)

The Ninth Circuit has interpreted "essential local safety hazard" to mean "the type of hazard that is properly dealt with on a local level" or as one that is not "adequately encompassed within national uniform standards." *Union Pac. R.R. Co.*, 346 F.3d at 859-860; *see also Duluth, Winnipeg, and Pac. Ry. Co.*, 529 F.3d at 798 (defining essentially local safety hazards as "local situations which are not statewide in character and not capable of being adequately encompassed within national uniform standards.") (citation and internal quotations omitted)). While similar, "a specific, individual hazard" concerns the existence of a more temporary hazardous situation. *See,*

1  *e.g.*, *Williams v. Norfolk S. Corp.*, 322 F.Supp.3d 896, 903 (N.D. Ind. 2018) ("The predominant

2  view among courts is that the duty to stop for a specific, individual hazard arises when a

3  'transient condition . . . could lead to a particular accident.'"). As previously noted, the presence

4  of an "essential local safety hazard" serves as an exemption to the FRSA's preemptive effect

5  where federal regulations cover the subject matter of state law. *See* 49 U.S.C. § 20106(a)(2)(A).

6        In regard to the existence of a "specific, individual hazard," Plaintiffs failed to respond to

7  Defendants' contentions regarding lack of evidence of a "specific, individual hazard." (*See* Pls.'

8  Resp.) In any event, the record evinces that there was but one other prior accident at the Crossing

9  in 1993. (Yates Decl. at ¶¶ 14-15, Ex. M (dkt. # 72-13) at 2, Ex. N (dkt. # 72-14) (Hennessey

10  Dep. at 38:7-17).) The existence of only one other accident at the Crossing fails to establish the

11  existence of a "specific, individual hazard." *See Murrell*, 544 F.Supp.2d at 1156-57 (finding that

12  a high fatality rate in a given area is not a specific, individual hazard); *Vigil v. BNSF Ry. Co.*, 521

13  F.Supp.2d 1185, 1211 (D. N.M. 2007) (finding that prior accident at a railroad crossing was not

14  specific, individual hazard).

15        As to the presence of an "essentially local safety hazard," Plaintiffs similarly fail to

16  demonstrate that the Crossing has characteristics that could not by addressed by national track

17  safety standards regarding the train's speed. In *Union Pacific R.R. Co.*, the Ninth Circuit

18  determined that an abnormally high derailment rate at the accident site and its steep grade and

19  sharp curve combination were not sufficiently local to fall within the "essentially local safety

20  hazard" exception. 346 F.3d at 859-861. The Ninth Circuit found the high derailment rate as not

21  unusual because all steep grades and sharp curves in the nation increase the risk of

22  derailment. *Id.* The Ninth Circuit further noted "although a high derailment rate may be evidence

23  of an existing hazard, it says nothing about the nature of the hazard itself." *Id.* at 861. Relevant to

REPORT AND RECOMMENDATION -30

the instant matter, the Ninth Circuit concluded that because there are many curves in the United States that shared the same characteristics as the one at the accident, the federal government could easily and adequately address such concerns with national standards as there is nothing "fundamentally" local about steep grade/sharp curve combinations. *Id.* at 862.

Here, Plaintiffs' amended complaint and submitted evidence details several features of the Crossing, including that it is unsafe because of the "horizontal alignment of the track and roadway at the crossing combined with the short approach to the crossing," the "presence of a nearby intersecting roadway," and "the maintenance of the transition between the approach roadway and the concrete surface." (Am. Compl. ¶¶ 48-49.) But as noted by the Ninth Circuit in *Union Pacific*, there is nothing inherently unique about the Crossing's alleged combination of factors due to the presence of such features at railroad crossings nationwide. *See Union Pac.*, 346 F.3d at 859-861. Because the Court fails to discern any features that would establish the Crossing as an "essentially local safety hazard," the Court finds that § 20106(a)(2)(A) does not apply to exempt Plaintiffs' preempted claims.

## C.    Negligence

In Washington, tort claims arising from a death caused by the negligence of another are "strictly a matter of legislative grace and are not recognized in the common law." *Philippides v. Bernard*, 151 Wash.2d 376, 390 (2004). The Washington wrongful death statute permits recovery by the deceased's personal representative for death caused by a "wrongful act" or neglect. RCW 4.20.010. To support a claim of negligence in a wrongful death action, the plaintiff must allege: (1) the defendant owed a duty of care; (2) that the defendant breached that duty; (3) proximately causing; (4) the resulting injury. *See Degel v. Majestic Mobile Manor, Inc.*,

1   129 Wash.2d 43, 48 (1996); *see also Weisenburg v. Townsend*, 102 Wash. App. 1018 (Wash.

2   App. Div. I 2000) (applying negligence factors to wrongful death action).

3              i.       *Duty of Care*

4              Defendants first argue that Plaintiffs' negligence claim is barred because Plaintiffs failed

5   to demonstrate Defendants breached a duty owed that proximately caused the collision at the

6   Crossing. (Defs.' Mot. at 8-9.) Specifically, Defendants argue that the Crossing was a private

7   crossing—and as such—Defendants did not breach a duty owed to Ms. Gonzalez Torres and I.G.

8   because they were licensees. [16] (*Id.*) Plaintiffs counter that a jury could find that Defendants

9   owed Ms. Gonzalez Torres and I.G. a duty of reasonable care to avoid injury to those using the

10  Crossing. (Pls.' Resp. at 9-10.) Plaintiffs cite that the majority view of jurisdictions hold that if

11  the public for a long time has customarily, constantly, openly, and notoriously crossed tracks not

12  on a public highway, the operating railroad is under a duty to exercise reasonable care and that

13  those factors are met by the characteristics of the Crossing in the instant case. (Pls.' Resp. at 9

14  (citing *Duty of Railroad Toward Persons Using Private Crossing or Commonly Used Footpath*

15  *Over or Along Tracks*, 167 A.L.R. 1253).)

16             Generally, the question of whether a duty exists is a question of law. *Degel*, 129 Wash.2d

17  at 48. A duty exists where there is a legal obligation "to conform to a particular standard of

18

19  ─────────────────────────
    [16] Defendants argue that courts in at least one jurisdiction have held that a person using a private crossing

20  "not known to be regularly and frequently used by the public is a licensee." (Defs.' Mot. at 9 (citing
    *Illinois Central Railroad Co. v. White*, 610 So.2d 308, 316 (Miss. 1992) (internal citations omitted)).)
    Under Washington law, Defendants contend that a landowner is only subject to liability for physical harm

21  to licensees if: (1) the possessor knows or should know of the condition and should realize that it poses an
    unreasonable risk of harm to the licensee; and (2) the possessor should expect that the licensee will not

22  discover or realize the danger; and (3) the possessor fails to exercise reasonable care to make the
    condition safe, or to warn the licensees of the condition and risks; and (4) the licensees do not know or
    have reason to know of the condition and the risk involved. (*Id.* (citing *Tincani v. Inland Empire*

23  *Zoological Society*, 124 Wash.2d 121, 133-34 (1965)).)

1    conduct toward another." *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 170 Wash.2d

2    442, 449 (2010) (citation and internal quotations omitted). The existence of a duty derives from

3    "considerations of logic, common sense, justice, policy, and precedent," *id.* at 449-50, and turns

4    "on the foreseeability of the risk created" by an action. *Parilla v. King County*, 138 Wash. App.

5    427, 436 (Wash. App. Div. I 2007). "A duty can arise either from common law principles or

6    from a statute or regulation." *Doss v. ITT Rayonier, Inc.*, 60 Wash. App. 125, 129 (Wash. App.

7    Div. II 1991) (citing *Bernethy v. Walt Failor's, Inc.*, 97 Wash.2d 929, 932 (1982)).

8         Once it is determined that a duty exists, the scope of that duty in particular circumstances

9    is a question of fact to be determined by the jury. *See Jarr v. Seeco Const. Co.*, 35 Wash. App.

10   324, 329-30 (Wash. App. Div. I 1983) (citing *Bernethy*, 97 Wash.2d at 933). As previously

11   noted, the Washington Supreme Court has held that—in determining the duty owed at a private

12   crossing—the adequacy of a railroad defendant's warning must be determined from the

13   circumstances presented relative to the crossing. *See Mulkey*, 65 Wash.2d at 123.

14        Here, as considered above, the Court has determined that Plaintiffs' claims regarding

15   audible warning, warning devices, and visual obstruction at the Crossing are not preempted by

16   the FRSA. Under Washington law, the scope of the duty owed by Defendants to Ms. Gonzalez

17   Torres and I.G. as to these claims depends on the circumstances existing at the Crossing that Ms.

18   Gonzalez Torres was faced with. *See Mulkey*, 65 Wash.2d at 123. As previously detailed,

19   Plaintiffs and Defendants have both submitted competing evidence regarding the adequacy of the

20   train's audible warning, the adequacy of the warning devices present at the Crossing, and the

21   overall dangerousness of conditions that existed at the Crossing due to its approach, layout, and

22   sightlines. (*See* Ogden Decl. at ¶ 2, Ex. 1 at 7, 10; Gill Decl. at ¶ 2, Ex. 1 at 5, 11; Flynn Decl. at

23   ¶ 7, Ex. 2 at 2-7, 12-13; Heikkila Decl. at ¶ 9, Ex. 2 at 7-9, 11, 13, 15.)

1    Based on the Court's review of the record, there remain genuine issues of material fact

2    regarding the conditions that existed at the Crossing. As such, the Court cannot find that

3    Plaintiffs' negligence claim is barred on the basis that Defendants did not breach a duty owed to

4    Ms. Gonzalez Torres and I.G. as they navigated the Crossing.

5                    *ii.*        *Causation*

6    A cause is a proximate cause if, "in a natural and continuous sequence, unbroken by any

7    new, independent cause, [it] produces the event, and without [it,] that event would not have

8    occurred." *See Graham v. Pub. Emps. Mut. Ins. Co.*, 98 Wash.2d 533, 538 (1983).

9    Proximate cause consists of both cause in fact—the connection between the act and the injury—

10   and legal causation. *Baughn v. Honda Motor Co.*, 107 Wash.2d 127, 142 (1986). The question of

11   cause in fact is generally a question for the jury, unless the facts are undisputed and reasonable

12   minds could not differ, in which case cause in fact may be decided as a matter of law. *Id.*

13   Defendants argue that Ms. Gonzalez Torres's undisputed failure to stop at the Crossing

14   was the sole and proximate cause of the collision. (Defs.' Mot. at 7-8.) Plaintiffs generally

15   concede that Ms. Gonzalez Torres did not stop at the posted stop sign prior to entering the

16   Crossing. (*See* Pls.' Resp. at 5.) Plaintiffs instead contend that Ms. Gonzalez Torres did not have

17   a legal duty to stop at the posted stop sign and that a reasonable jury could find that Defendants

18   breached the standard of care owed to Ms. Gonzalez Torres and were ultimately responsible for

19   the collision. (*Id.* at 5-10.)

20   On this issue, the evidence is undisputed as to Ms. Gonzalez Torres's failure to stop at the

21   posted stop sign. Event recorder data from Ms. Gonzalez Torres's vehicle, and contemporaneous

22   footage from the train, demonstrate that Ms. Gonzalez Torres's vehicle never came to a complete

23   stop before entering the Crossing. (Young Decl. at ¶¶ 9, 12, Ex. 5 at 3-11.) In addition, Ms.

REPORT AND RECOMMENDATION -34

1   Tedoro testified that Ms. Gonzalez Torres was aware of the stop sign, but routinely failed to stop

2   before entering the Crossing. (Yates Decl. at ¶ 2, Ex. A at 5 (Tedoro Dep. at 15:4-16:13,

3   19:3-10).)

4         As to Plaintiffs' first contention, the Court finds that Ms. Gonzalez Torres maintained a

5   legal duty to stop at the posted stop sign at the Crossing. Clark County Municipal Code

6   10.02.010 adopts the entirety of Washington Administrative Code Chapter 308-330. Pursuant to

7   WAC 308-330-415, and its adoption of RCW 46.61.190, "every driver of a vehicle approaching

8   a stop sign shall stop" unless an applicable exception applies. Under WAC 308-330-421, and its

9   adoption of RCW 46.61.340 and 46.61.345, Ms. Gonzalez Torres maintained a legal duty to stop

10  at the Crossing. *See* RCW 46.61.340 ("Whenever any person driving a vehicle approaches a

11  railroad grade crossing . . . the driver of such vehicle shall stop within fifty feet but not less than

12  fifteen feet from the nearest rail of such railroad, and shall not proceed until the crossing can be

13  made safely. The foregoing requirements shall apply when . . . an approaching railroad train or

14  other on-track equipment is plainly visible and is in hazardous proximity to such crossing."); 

15  RCW 46.61.345 ("When such stop signs are erected the driver of any vehicle shall stop within

16  fifty feet but not less than fifteen feet from the nearest rail of the railroad and shall proceed only

17  upon exercising due care.").

18        As to Plaintiffs' second contention, however, the Court agrees that genuine issues of

19  material fact exist that preclude this Court from finding that Ms. Gonzalez Torres's failure to

20  stop at the posted stop sign was the sole proximate cause of the collision at the Crossing. On this

21  point, Plaintiffs cite to *Eichler v. Yakima Val. Transp. Co.*, 83 Wash.2d 1 (1973). In *Eichler*, a

22  motorist was killed when his car collided with a train at a railroad grade crossing. *Id.* at 2. The

23  defendants contended that the deceased motorist was contributorily negligent as a matter of law

1    because he failed to yield the right-of-way to the train at the crossing. *Id.* The Washington

2    Supreme Court found that because there were conflicts in the evidence as to the deceased

3    motorist's speed and the provided audible warning, "it remained for the jury to decide whether

4    the train was plainly visible and in hazardous proximity to the crossing thereby acquiring the

5    right-of-way provided by RCW 46.61.340(1)(c)." *Id.* at 4. Thus, the Washington Supreme Court

6    concluded whether the deceased motorist proximately caused the accident was a factual issue

7    reserved for the jury. *Id.* (citing *Ward v. Zeugner*, 64 Wash.2d 570 (1964)); *see also Speicher v.*

8    *Union Pac. R.R.*, 2008 WL 4810293, at *3, 5 (W.D. Wash. Oct. 31, 2008) (finding material issue

9    of fact existed as to whether defendant was negligent in crossing the railroad tracks, and whether

10   or not such negligence was the proximate cause of train collision).

11           The Court agrees that whether Ms. Gonzalez Torres was the proximate cause of the

12   collision at the Crossing remains a question for the jury based on the conflicts of evidence in this

13   case. As noted above, it is undisputed that Ms. Gonzalez Torres failed to stop at the posted stop

14   sign at the Crossing. However, Plaintiffs have submitted sufficient evidence demonstrating that

15   conditions that existed at the Crossing interfered with her apprehension of the oncoming train. Of

16   note, Ms. Gill found that the Crossing was inherently dangerous for several reasons, including

17   that due to the angle of the approach of the roadway to the Crossing and vegetative obstructions

18   that existed at the Crossing, a motorist approaching the Crossing from Southwest Viola would

19   not have any visual cues as to the presence of an oncoming train until approximately 25 feet

20   from the track. (*See* Gill Decl., Ex. 1 at 8.) Ms. Gill further concluded that Ms. Gonzalez

21   Torres's motorist behavior of failing to stop at the Crossing was consistent with the majority of

22   motorists traveling over the Crossing based on an observational study. (*See id.* at 11.) On this

23   point, Ms. Tedoro testified that Ms. Gonzalez Torres regularly interacted with the Crossing as

part of her cleaning business, but never encountered a train at the Crossing, and therefore, did not routinely stop. (Yates Decl. at ¶ 2, Ex. A at 5 (Tedoro Dep. at 19:3-10, 36:3-15).) Finally, Mr. Ogden concluded that Railroad Defendants allowed hazardous conditions to exist at the Crossing, including improper design and layout, because the Crossing required motorists to descend a steep downhill grade and to round a sharp curve prior to a short roadway approach to cross and due to impaired sight distances from vegetative obstruction. (Ogden Decl. at ¶ 2, Ex. 1 at 6-8, 10-13.) Mr. Ogden additionally noted that Railroad Defendants failed to give a proper audible warning of the train's approach at the Crossing. (*Id.* at 6, 23-24.)

Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that genuine issues of material fact exist regarding whether Ms. Gonzalez Torres's view of the train was obstructed and whether or not conditions present at the Crossing adequately warned of its oncoming approach. Accordingly, the Court concludes that summary judgment is not appropriate on Defendants' claim that Ms. Gonzalez Torres's failure to stop at the posted stop sign at the Crossing was the sole and proximate cause of the collision at the Crossing.

## IV.    CONCLUSION

For the foregoing reasons, this Court recommends that Defendants' Motion (dkt. # 71) be GRANTED in part and DENIED in part. Specifically, the Court finds that: (1) Plaintiffs' excessive speed, slow order, track inspection, and failure to train claims are preempted under the FRSA, and therefore, should be dismissed; (2) Plaintiffs' audible warning, warning devices, and visual obstruction claims are not preempted under the FRSA; and (3) genuine issues of material fact preclude dismissal of Plaintiffs' remaining negligence claims. A proposed Order accompanies this Report and Recommendation.

1    Objections to this Report and Recommendation, if any, should be filed with the Clerk and

2    served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and

3    Recommendation is signed. Failure to file objections within the specified time may affect your

4    right to appeal. Objections should be noted for consideration on the District Judge's motions

5    calendar for the third Friday after they are filed. Responses to objections may be filed within

6    **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be

7    ready for consideration by the District Judge on **January 28, 2021**.

8    The Clerk is directed to send copies of this Report and Recommendation to the parties

9    and to the Honorable Benjamin H. Settle.

10    Dated this 12th day of January, 2022.

11

12    MICHELLE L. PETERSON
      United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

REPORT AND RECOMMENDATION -38