UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

TIM NAY, et al.,

        Plaintiffs,

v.

BNSF RAILWAY COMPANY, et al.,

        Defendants.

CASE NO. C19-5425 BHS-MLP

ORDER

THIS MATTER is before the Court on Magistrate Judge Michelle Peterson's Report and Recommendation ("R&R"), Dkt. 96, recommending the Court grant in part and deny in part Defendants BNSF Railway and Amtrak's Motion for Summary Judgment, Dkt. 71. Both Defendants and Plaintiff Tim Nay, as personal representative of the Estate of Maria Gonzalez Torres, have filed objections to the R&R. Dkts. 101 and 102.

The facts are detailed in the R&R and need not be repeated here. Dkt. 96 at 2–5. In May 2016, Gonzalez Torres' vehicle approached an at-grade, unguarded private railroad crossing over BNSF's railroad tracks at Southwest 5th Avenue and Southwest Viola Street, just north of the Columbia River in Camas, Washington (the "Viola Crossing").

The speed limit on the class 4 track at that location was 80 miles per hour. The private crossing did not have gates or bells or lights, but it did have a stop sign. It is apparently undisputed that, as was her practice, Gonzalez Torres did not stop at the sign. She was also on her cell phone at the time. The engineer of a westbound Amtrak locomotive traveling at 70 miles per hour saw Gonzalez Torres' vehicle roll through the stop sign and into the crossing, sounded the locomotive's horn, and applied its air brakes. The Amtrak locomotive struck the vehicle and Gonzales Torres died at the scene. Her minor son, I.G.,[1] was injured but survived.

     Nay sued BNSF and Amtrak in May 2019. Dkt. 1. He amended his complaint in November 2019. Dkt. 31. He alleges that BNSF and Amtrak violated their duties to Gonzalez Torres in several ways. He argues the Amtrak crew failed to give a proper audible warning while approaching the crossing, and that neither defendant required train crews to sound the horn at the crossing. Dkt. 31 at 6–7. Nay alleges that the defendant railroads also failed to give reasonable visual warnings, including lights and unobstructed sight lines. *Id*. at 7–8. He also alleges that the railroads knew of hazardous conditions at the crossing and ignored them, and that the Amtrak train was speeding and had a malfunctioning speedometer. He asserts that if the train was not speeding, the section of track including the Viola Crossing should have been subject to a "slow order." And he alleges the Amtrak crew failed to take required action to avoid "specific, individual hazards," and that the Viola Crossing was an essentially "local hazard," such that his

---

[1] I.G.'s Guardian ad Litem, Gregory Price, is also a plaintiff. This Order refers to the plaintiffs together as "Nay" for clarity.

claims based on its condition are not subject to preemption. *Id*. at 8–10. In short, Nay asserts that defendants had a duty to ensure that the crossing was safe, that they failed to execute that duty, and that his claims are not preempted by any contrary federal regulation.

BNSF and Amtrak seek summary judgment, arguing that Gonzales Torres was the sole cause of the accident as a matter of law, and that even if causation is a factual issue, Nay's state law tort claims are preempted by the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20106(a)(1). *See* Dkt. 71.

Judge Peterson's R&R concluded that Nay's excessive speed, slow order, track inspection, and failure to train claims are preempted by the FRSA and recommended that the Court grant Defendants' motion and dismiss those claims with prejudice. The R&R concluded that Nay's audible warning, warning devices, and visual obstruction claims were not pre-empted, and recommended that the Court deny Defendants' motion on those claims. It also recommended that the Court deny Defendants' summary judgment motion based on its claim that Gonzales Torres was the sole proximate cause of the accident as a matter of law, concluding that the proximate cause(s) of the accident presented a factual question requiring a trial. Dkt. 96 at 37.

Nay objects only to the recommended dismissal of his excessive speed claim. Dkt. 101. He argues that the Amtrak train had a malfunctioning speedometer, and that even when a regulation covers the subject matter of a claim, the claim avoids preemption if the railroad allegedly violated a federal rule or an internal standard of care that was created

pursuant to a federal regulation. *Id.* at 2 (citing *Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170, 177 (3rd Cir. 2013)).

The railroads object to the R&R's conclusion that Nay's claims based on the train's audible warning, the crossing's warnings, and the crossing's visual obstructions (vegetation) were not preempted, and the ensuing recommendation that the Court deny their motion on those claims. Dkt. 102. They argue that the case upon which the R&R largely relied, *Mulkey v. Spokane Portland and Seattle Railway Co.*, 65 Wn.2d 116 (1964), was decided long before the statutes and regulations at issue were enacted, and that its fact-specific analysis is no longer precedential. They also argue that no jury could find that the accident was caused by anyone or anything other than Gonzalez Torres' failure to stop at the Viola Crossing. Dkt. 102. Nay did not respond to those objections.

A district judge must determine de novo any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. Fed. R. Civ. P. 72(b)(3). A proper objection requires specific written objections to the findings and recommendations in the R&R. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Nevertheless, objections to a Magistrate's Report and Recommendation are not an appropriate vehicle to rehash or re-litigate the points considered and resolved by the Magistrate Judge. *See, e.g.*, *El Papel LLC v. Inslee*, No. 20-cv-01323 RAJ-JRC, 2021 WL 71678, at *2 (W.D. Wash. Jan. 8, 2021) ("Because the Court finds that nearly all objections are merely a rehash of arguments already raised and decided upon by the

ORDER - 4

Magistrate Judge, the Court will not address each objection here."); *Aslanyan v. Herzog*, No. 14-cv-0511 JLR, 2014 WL 7272437, at *1 (W.D. Wash. Dec. 17, 2014) (rejecting a challenge to a Magistrate's Report and Recommendations when "all of [plaintiff's] objections simply rehash arguments contained in his amended opening memorandum or in his reply memorandum"). As Courts in other Districts have recognized and explained, such re-litigation is not an efficient use of judicial resources.

There is no benefit to the judiciary "if the district court[] is required to review the entire matter *de novo* because the objecting party merely repeats the arguments rejected by the magistrate. In such situations, this Court follows other courts that have overruled the objections without analysis." *Hagberg v. Astrue*, No. CV-09-01-BLG-RFC-CSO, 2009 WL 3386595, at *1 (D. Mont. Oct. 14, 2009). In short, an objection to a magistrate's findings and recommendations "is not a vehicle for the losing party to relitigate its case." *Id*. See also *Conner v. Kirkegard*, No. CV 15-81-H-DLC-JTJ, 2018 WL 830142, at *1 (D. Mont. Feb. 12, 2018); *Fix v. Hartford Life & Accident Ins. Co.*, CV 16-41-M-DLC-JCL, 2017 WL 2721168, at *1 (D. Mont. June 23, 2017) (collecting cases); *Eagleman v. Shinn*, No. CV-18-2708-PHX-RM (DTF), 2019 WL 7019414, at *4 (D. Ariz. Dec. 20, 2019) ("[O]bjections that merely repeat or rehash claims asserted in the Petition, which the magistrate judge has already addressed in the R&R, are not sufficient under Fed. R. Civ. P. 72.").

Nay does not object to the R&R's recommended dismissal of his slow order, track inspection, and failure to train claims. Those portions of the R&R are ADOPTED,

defendants' motion for summary judgment on those claims, Dkt. 71, is GRANTED, and they are DISMISSED with prejudice.

The remaining issues are addressed in turn.

**A.   Nay's "excessive speed" claim is dismissed.**

Amtrak's[2] motion argued that Nay's excessive speed claim was preempted because the train was traveling below the federal speed limit at the time of the accident. The R&R agreed. Nay objects to the R&R's conclusion that his tort claim based on the speed of the Amtrak train is pre-empted by the FRSA, and its recommended dismissal of that claim on summary judgment.

To promote uniform national railroad safety standards, the FRSA expressly preempts state law tort law where a national regulation or order covers the subject matter of the state requirement. *See* FRSA § 20106(a)(2). A federal rule or regulation preempts state law where it substantially subsumes the subject matter of the relevant state law. *See Zimmerman*, 706 F.3d at 176 (citing *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). The FRSA was amended in 2007 to clarify the scope of pre-emption. A new subsection, § 20106(b)(1), explains that the FRSA does not preempt state law claims based on allegations that (A) "a party has failed to comply with the Federal standard of care established by a regulation or order," or (B) "has failed to comply with its own plan, rule, or standard[.]" 49 U.S.C. § 20106(b)(1)(A)–(B); *see also Zimmerman*, 706 F.3d at 178.

---

[2] Nay's "train handling" claims are directed at Amtrak. Its "crossing condition" claims are asserted primarily against the track's owner, BNSF.

ORDER - 6

1    The R&R concluded that Nay's excessive speed claim was preempted by the
federal speed limit on that section of "Class 4" track. It is beyond dispute that the train was traveling 70 miles an hour, less than the federally prescribed 80 mile an hour speed limit, and any claim based on Amtrak's "self-imposed" speed limit was therefore preempted. Dkt. 96 at 20. It relied on authority both pre- and post-dating the FRSA's 2007 amendments, holding that an excessive speed claim is preempted when the train is complying with federal speed limits. Dkt. 96 at 19–20 (citing *Peters v. Union Pac. R.R. Co.*, 455 F. Supp. 2d 998, 1002 (W.D. Mo. 2006) ("[I]f the train was traveling within the federal speed limit, then the FRSA preempts any state or common law claim as to excessive speed."); *see also Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 638 (5th Cir. 2005) (FRSA preempts excessive speed claim based on violation of a self-imposed speed limit); and *Veit, ex. Rel. v. B.N.S.F.*, 171 Wn.2d 88, 103–04 (2011) (collecting authority rejecting excessive speed claims where train exceeded internal speed limits).

Nay objects to the recommended dismissal of his excessive speed claim, arguing that he has both alleged and provided evidence that the train's speedometer was malfunctioning, and that under a Federal Regulation (49 C.F.R. § 229.117) and Amtrak's own rules (Train Handling Rule 101.11), a "controlling train" travelling more than 20 miles per hour must have a speedometer accurate to within +/- 5 miles per hour at speeds above 30 miles per hour, and the speedometer must be "readable from the engineer's position under all light conditions." Dkt. 101 at 3.

He argues that, under *Zimmerman* and § 20106(b)(1)(A) and (B), his tort claim avoids preemption because he alleged that the malfunctioning speedometer violated both

ORDER - 7

federal regulations and Amtrak's own internal train handling rules. He asserts that if the speedometer fails in route, Amtrak's own rules provide that the locomotive may proceed at normal speed only until it reaches a facility where repairs can be made. *Id*. at 4. He argues that the rule provides that any movement beyond such a facility may not exceed 20 miles an hour. *Id*. Nay argues that viewed in the light most favorable to him, the evidence establishes that the speedometer was not accurate and was not properly lit, making it not visible to the engineer in all light conditions. *Id*. Thus, he claims, the train should have been travelling no more than 20 miles per hour, and that his excessive speed claim is not preempted under § 20106(b)(1).

Amtrak responds that there is no evidence that the train was exceeding the applicable speed limit, or that its speedometer was not accurate to within +/- 5 miles per hour. It also argues there is no evidence that even if the speedometer was malfunctioning, it could have been repaired at any facility between Chicago and the site of the accident, just short of Portland. Instead, the only evidence is that the only such facilities near the route are in Chicago and Seattle. Thus, there is no factual basis for Nay's claim that the internal speed limit applicable to the Amtrak train was 20 miles per hour. Dkt. 106 at 3.

Amtrak also argues there is no evidence that the train's speedometer (or its excessive speed) was a proximate cause of the accident. Nay's own expert, Brandon Ogden, opined that the train was traveling below the applicable federal speed limit and that the allegedly malfunctioning speedometer played no role in the accident. Dkt. 72-15. Amtrak argues that the R&R correctly determined that Nay's excessive speed claim is preempted and fails as a matter of law. *Id*.

ORDER - 8

The Court agrees. Nay's reliance on *Zimmerman* and Amtrak's own rule about train handling in the face of a speedometer malfunction is misplaced. In *Zimmerman*, the plaintiff alleged that the train was *exceeding* the federal speed limit, by 100%. In concluding that the claim was not preempted, the Third Circuit explained that under *Easterwood*, speed claims are preempted when the train is—as it was here—traveling *below* the federally-mandated speed limit. "*Easterwood* is inapposite here because Zimmerman alleges that the train he collided with was travelling *above* the speed limit." *Zimmerman*, 706 F.3d at 179 (emphasis in original).

There is no evidence that the Amtrak train was traveling above the applicable 80 mile per hour speed limit, or that its speedometer played any role in the accident. Even if Nay's allegations of Amtrak's violation of an internal rule regarding speed was enough to avoid FRSA preemption on a motion to dismiss, Amtrak seeks summary judgment. The summary judgment standard does not test of the plausibility of Nay's allegations, but rather the evidence in support of them. Nay has no evidence that the train's speed was excessive, or that the train's speedometer was a proximate cause of the accident. Nay's excessive speed claim is preempted, it is not a viable basis for a negligence claim.

The R&R's recommended resolution of this issue is ADOPTED. Nay's excessive speed claim is preempted, and it fails as a matter of law. Defendants' summary judgment motion on that claim, Dkt. 71, is GRANTED, and it is DISMISSED with prejudice.

**B.    Nay's audible warning claim is preempted, and it is dismissed.**

Nay also asserts a tort claim based on his claim that the Amtrak train was required to and failed to sound its horn earlier than it did.

ORDER - 9

Amtrak seeks summary judgment on this claim, arguing that any tort claim based on the failure to sound the horn is preempted by federal regulations that explicitly do not require a horn sounding at private crossings like the Viola Crossing. Dkt. 71 at 16. It argues that federal regulations require an audible warning only when approaching public highway crossings, and not for a private crossing. Dkt. 71 at 16 (citing 49 C.F.R. § 222.21(a)). Amtrak also argues that in an emergency, the engineer has discretion to sound the horn, but is not required to do so. *Id*. at 17 (citing 49 C.F.R. § 222.23(a)(2)) ("[T]his part does not preclude the sounding of locomotive horns in emergency situations, nor does it impose a legal duty to sound the locomotive horn in such situations."). Amtrak argues that Gonzalez Torres' driving into the crossing without stopping at the posted stop sign created an emergency, and the engineer sounded the train's horn (and applied its air brakes) as soon as he saw her car. *Id*. at 19.

Nay's summary judgment response relies on the federal regulation regarding the use of horns at private crossings, 49 C.F.R. § 222.25. That regulation explains both that federal law does *not* require the routine use of a horn at private crossings, and that where state law *does* require the use of a horn, it shall be sounded in the manner prescribed for public crossings:

> This rule does not require the routine sounding of locomotive horns at private highway-rail grade crossings. However, where State law requires the sounding of a locomotive horn at private highway-rail grade crossings, the locomotive horn shall be sounded in accordance with § 222.21[.]

*See* Dkt. 86 at 14. Nay argued that Washington common law requires that trains sound their horn at "dangerous" crossings. *Id*. at 13 (citing *Ploegman v. Burlington N. and*

*Santa Fe Railway Co.*, 112 Wash. App. 1001 (2002) ("Whether or not a railroad's duty of ordinary care includes providing a warning that a train is approaching and, if so, the adequacy of the warning, depends upon the circumstances relating to the particular crossing at the particular time and under the particular circumstances.").

The R&R characterized Nay's position as an assertion that Washington common law requires that a train's "horn be sounded at private crossings under certain circumstances, and such circumstances existed because the Viola Crossing was dangerous given its condition." *See* Dkt. 96 at 15. It rejected Nay's reliance on *Ploegman* because it was unpublished. *Id.* at 16. Nevertheless, relying on the case *Ploegman* cited, *Mulkey*, the R&R concluded that Washington common law[3] required the engineer to sound the horn based on the Viola Crossing's dangerous nature. *Id*. at 17 (citing *Mulkey*, 396 P.2d at 123) ("The adequacy of the defendant's warning must be determined from the circumstances relative to [the] particular road at [the] particular time and under [the] particular circumstances[.]"). The R&R also rejected Amtrak's contention that the situation was an emergency, governed by § 222.23(a)(2)). *Id*.

It concluded that because Nay had set forth evidence that the Viola Crossing was "innately dangerous," Nay's audible warning claim was not preempted and that it presented a question of fact for the jury, and recommended that the Court deny Amtrak's summary judgment motion on Nay's audible warning claim. *Id.*

---

[3] Amtrak points out that Nay did not cite *Mulkey*, and that his amended complaint does not assert that the conductor had a common law duty to sound the horn at the Viola Crossing. Nay did not respond to Amtrak's objections, and has not offered any authority establishing that there was a duty to sound the horn.

ORDER - 11

1  Amtrak objects, arguing that Washington common law does not require trains to
2  sound horns at private crossings. It argues persuasively that *Mulkey* was decided on
3  specific facts, pre-dates the FRSA, and relied on a Washington statute (former RCW
4  81.48.010) which was repealed in response to the 2007 FRSA amendments. Dkt. 102 at
5  5–7 (citing Washington State House of Representatives, Transportation Committee, Bill
6  Analysis of SHB 1312) ("[T]he federal government has passed legislature preempting
7  state authority in, or deregulating various aspects, of the nation's transportation system.")

8  The Court agrees that *Mulkey* does not establish a common law duty to sound a
9  train's horn at private crossings. It was expressly based on a unique factual context. It
10 held that because the train crew "knew" that the adjacent landowner, a bean farmer, was
11 harvesting and that the crossing roadway was accordingly "in use by many people," it
12 was "negligence as a matter of law for the engine crew to fail to give timely notice of the
13 approach of the train"—"*whether or not* the statute [regarding the use of a horn] was
14 applicable." *Id*. at 163 (emphasis added).

15 As the Washington Supreme Court recently reiterated, while the *scope* of a duty is
16 ordinarily a question for the trier of fact, the *existence* of a duty is a question of law for
17 the court. *KcKown v. Simon Prop. Grp., Inc.*, 182 Wn.2d 752, 762 (2015) (collecting
18 cases). Concepts of foreseeability serve to define the scope of the duty owed, not whether
19 there is a duty in the first place. *Id*.

20 *Mulkey* is not authority for the proposition that the Amtrak crew had a duty to
21 sound the horn at the Viola Crossing. The statute upon which it partly relied was repealed
22 long before the accident. A state common law rule requiring a crossing-by-crossing, case-

1  by-case evaluation of the specific circumstances of the crossing (including the crew's
2  subjective knowledge of who might be using the crossing and why) to determine whether
3  it had a duty to sound the horn on a given day is inconsistent with the FRSA's goal of a
4  uniform set of national rules for the regulation of train operations, and it is unworkable.

5  Furthermore, Nay's conclusory claim (accepted by the R&R) that the crossing was
6  "innately dangerous" is unsupported by evidence. Amtrak demonstrates that there has
7  only been one other accident at the crossing, in 1993. Dkt. 71 at 15. The crossing is
8  properly posted under federal and state law, including the stop sign. The conclusion that
9  the crossing remains inherently dangerous is also impossible to square with Nay's
10 simultaneous claim, discussed below, that drivers have no duty to stop at the posted stop
11 sign. It is also inconsistent with Gonzales Torres' apparent habit of failing to stop at the
12 sign over the year that she regularly used the Viola Crossing. Her failure to stop and look
13 for an approaching train created the danger at the crossing, and it created an emergency.
14 The engineer in his discretion responded by sounding his horn. 49 C.F.R. § 222.23(a)(2).
15 He had no obligation to sound it in advance, as a matter of law.

16 The Court therefore DECLINES to adopt the R&R on this issue. The applicable
17 federal regulations do not require a horn at private crossings, and there is no contrary
18 Washington common law. Nay's audible warning claim is pre-empted. Amtrak's
19 summary judgment motion on that claim is GRANTED, and it is DISMISSED with
20 prejudice.

1  **C.  Nay's active warning device claim is pre-empted, and it is dismissed.**

2   Nay also asserts a tort claim based on his allegation that, because the crossing was
3   dangerous, the railroads should have installed additional warning devices, such as
4   flashing light signals. BNSF seeks dismissal of this claim, arguing it is preempted by
5   federal regulations that do not require such devices at private crossings.

6   Nay argues that preemption applies only where the railroad can demonstrate that
7   federal funds were used in the installation of warnings at the crossing. Dkt. 86 at 17
8   (citing *Easterwood*). The R&R agreed, and concluded that Nay's warning devices claim
9   was not preempted, because BNSF could not demonstrate that federal funds were used to
10  install the crossing. Dkt. 96 at 22–23.

11  BNSF objects, arguing that the R&R erroneously conflated the requirements
12  applicable to a public crossing with those applicable to a private crossing like the Viola
13  Crossing. Dkt. 102 at 10–11. BNSF also argues that, in any event, there is no evidence
14  supporting Nay's claim that additional warning devices were required; his expert, Ogden,
15  agrees that the "stop sign, crossbuck, and DOT inventory signs" at the Viola Crossing are
16  the only protections required by federal law. *Id*. (citing Ogden Deposition, Dkt. 72-15).

17  The Court agrees. The authority upon which the R&R and Nay relied relate to the
18  expenditure of federal funds on *public* railroad crossings, not private ones like the Viola
19  Crossing. There is no evidence that any regulation or state law required additional
20  warning devices at the Viola Crossing.

21  The Court therefore DECLINES to adopt the R&R's recommended resolution of
22  this issue. Nay's visual warning claim is preempted by federal regulations, and that

preemption does not require the expenditure of federal funds on the crossing. The Defendants' summary judgment motion on that claim is GRANTED, and it is DISMISSED with prejudice.

**D.  Nay's visual obstruction claim is pre-empted, and it is dismissed.**

Nay asserts a negligence claim based on the allegation that BNSF failed to clear visibility obstructions (vegetation) from its own right-of-way, and failed to work with adjacent landowners or local officials to provide a safe crossing.[4]

BNSF seeks summary dismissal of this claim, arguing that there is no evidence that the sight distance at the crossing was impaired or unsafe, and that the claim is preempted by federal law. As to the former, it relies on photographs taken the day of the accident showing that the sight lines from the stop sign were clear in both directions, and points out that Nay's experts did not visit the site or take photographs of or measure the sight lines. Dkt. 71 at 21.

The R&R acknowledged that 49 C.F.R. § 213.37 preempts state regulation of "vegetation on or immediately adjacent to the tracks," Dkt. 96 at 25, but concluded that state common law claims based on visual obstructions caused by vegetation *outside* that area are not preempted. *Id*. (citing *Peters*, 455 F. Supp. 2d at 1003). It concluded that whether such vegetation impaired Gonzalez Torres' view of the tracks presented a

---

[4] BNSF asserts that Nay has abandoned this part of his claim. Dkt. 102 at 14, but it was addressed in the R&R. The more persuasive argument is that Nay and his experts have identified no basis for any duty on the railroads' part to "work with the adjacent landowners" to remove obstructing vegetation that is not in or immediately adjacent to the right of way.

question of fact, and recommended that the Court deny BNSF's summary judgment motion on this issue. Dkt. 96 at 25–26 and 35–37.

BNSF objects, arguing there is no evidence that any vegetation impaired Gonzales Torres' view of the tracks from the properly posted stop sign. It includes a photograph taken by the Sherriff on the day of the accident, taken from the stop sign looking east, toward the oncoming train:



Dkt. 102 at 14; *see also* 75-3.

BNSF argues that, had she stopped as required, Gonzales Torres could have seen a half a mile down the track, to her left in this picture. *Id*. (citing Dkt. 75-5). There is no conflicting evidence supporting the allegation that some non-preempted vegetation

impairment obscured Gonzales Torres' view, and Nay's conclusory claim[5] that the view was obstructed by "vegetation not in or adjacent to" the tracks is not sufficient to defeat summary judgment.

The Court therefore DECLINES to adopt the R&R's recommended resolution of this issue. Any visual obstruction claim based on the vegetation in or adjacent to the track is preempted, and there is no evidence supporting the claim that some vegetation outside that area obstructed Gonzales Torres' view of the tracks the day of the accident. The Defendants' summary judgment motion on that claim is GRANTED, and it is DISMISSED with prejudice.

**E.    There is no evidence the accident was caused by anything other than Gonzalez Torres' failure to stop at the posted stop sign.**

The railroads' summary judgment motion also argues that, even if Nay's claims are not preempted, there is no evidence supporting a finding that the accident was proximately caused by anything other than Gonzales Torres' failure to stop before crossing the tracks. Dkt. 71 at 8.

The R&R concluded that because Nay's audible warning, warning devices, and visual obstruction claims were not preempted, his negligence claims based on the breach of those alleged duties survived summary judgment because a reasonable jury could find that such breaches were a proximate cause of the accident.

---

[5] Relying on three photographs that he did not take and which are not described, Nay's expert opines that the Viola Crossing has "visibility obstructions." Dkt. 89-1 at 12. The photographs are not taken from the location of the stop sign; they are taken from up the hill, further away from the tracks. They are not an accurate depiction of the view down the tracks from the posted stop sign.

The Court cannot agree. First, as discussed above, Nay's claims are preempted by the FRSA. But even if Nay's state law tort claims—negligence claims, based on the alleged breaches of duties Nay claims were imposed by state or federal law, or by the railroads' own train handling rules—were not preempted, the railroad defendants persuasively argue that there is no evidence that the accident was caused by anything other than Gonzalez Torres' failure to stop at the stop sign posted at the crossing, and to look for an approaching train. Dkt. 71 at 9. They demonstrate that despite her familiarity with the crossing, Gonzalez Torres "never" stopped at that stop sign because (remarkably) she had never seen a train there. Indeed, Nay asserts that because the Viola Crossing was private, state law did not require Gonzales Torres to stop at the stop sign, and that she "was not negligent as a matter of law." Dkt. 86 at 9.

The R&R concluded that there was a question of fact over the cause of the accident, or, put another way, that a reasonable jury could find that some failure by Amtrak or BNSF was a proximate cause of the accident. It apparently did so because it determined that Nay's audible warning, visual warning, and visual obstruction claims were not preempted by the FRSA, and thus that they were viable bases for for a state law tort claim.

The defendant railroads persuasively assert that all the alleged duties upon which Nay's claims are based are preempted by the FRSA, and that, in any event, there is no evidence whatsoever that anything other than Torres Gonzales' failure to stop at the stop sign (and to look for an approaching train) was the cause of the accident. Nay did not respond to the defendants' objections, and the Court agrees with the railroads.

There is no evidence supporting the conclusion that the tragic accident that took Gonzalez Torres' life and injured her son was caused by anything other than her failure to stop at the properly posted stop sign and look for a train. The Amtrak train was operating under the applicable speed limit, as a matter of law, and there is no evidence that any speedometer malfunction was a proximate cause of the accident. That claim is preempted by the federal regulation.

The train's crew was not required under any applicable law to sound its horn in advance of the crossing. Nor were the railroads under any obligation to have additional warning devices, or to remove vegetation or any other visual obstruction at the private crossing; there is no evidence the crossing had such obstructions. The Viola Crossing was not unique, and it was not innately dangerous. It was a properly signed and maintained private crossing.

Nay's claim that Gonzales Torres had no duty to stop at the stop sign is effectively an argument that there should not have been a stop sign at the Viola Crossing, at all. Drivers are not free to ignore stop signs they believe should not be in place. Nay's assertion that Washington drivers are never required to stop before crossing an unguarded private railroad crossing—even if there is stop sign—defies common sense, and it is contrary to state and federal law. It is also inconsistent with his claim that, even *with* a stop sign, the Viola Crossing was uniquely dangerous. Nay's case would have been far stronger if there was *not* a stop sign at the Viola Crossing.

A reasonable jury could not find that the accident was caused by any failure other than Torres Gonzales' failure to heed the stop sign. Nay has not asserted any negligence

claim that is based on any non-preempted duty, or for which he has any evidence. The Court therefore DECLINES to adopt the R&R's recommended denial of defendants' summary judgment motion on the issues of duty and proximate causation.

The defendant railroads' motion for summary judgment on Nay's state law tort claims is GRANTED, and all his claims against BNSF and Amtrak are DISMISSED with prejudice. The Clerk shall enter a judgment and close the case.

IT IS SO ORDERED.

Dated this 16th day of August, 2022.

BENJAMIN H. SETTLE
United States District Judge